UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE ALUMINUM WAREHOUSING ANTITRUST LITIGATION | MDL No. 2481<br>Master Docket No.<br>13 MD 2481 (PAE) |

This Document Relates To:

*In re Aluminum Warehousing Antitrust Litigation* (First Level Purchaser Plaintiffs), Case No. 1:14-cv-03116-PAE (S.D.N.Y.)

*Agfa Corporation and Agfa Graphics, N.V. v. The Goldman Sachs Group, Inc.* (Agfa), Case No. 1:14-cv-0211-PAE (S.D.N.Y.)

*Mag Instrument, Inc. v. The Goldman Sachs Group, Inc.* (Mag), Case No. 1:14-cv-00217-PAE (S.D.N.Y.)

*Eastman Kodak Company v. The Goldman Sachs Group, Inc.* (Kodak), Case No. 1:14-cv-06849-PAE (S.D.N.Y.)

*FUJIFILM Manufacturing U.S.A., Inc. v. Goldman Sachs & Co., et al.* (Fujifilm), Case No. 1:15-cv-08307-PAE (S.D.N.Y.)

**DEFENDANTS' REPLY TO THE FLPS' AND IPS' RESPONSE TO**
**<u>DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS</u>**

# TABLE OF CONTENTS

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................................ 1

I.    FLPs' Aluminum Purchases. ............................................................................................. 4

    A.    Ampal Inc. ................................................................................................................ 6

    B.    Claridge Products and Equipment, Inc. .............................................................. 16

    C.    Custom Aluminum Products, Inc. ....................................................................... 20

    D.    Extruded Aluminum, Inc. .................................................................................... 25

II.    IPs' Aluminum Purchases. ............................................................................................. 29

    A.    Agfa Corp. and Agfa Graphics N.V. ................................................................. 31

    B.    Fujifilm Manufacturing U.S.A., Inc. .................................................................. 36

    C.    Eastman Kodak Company ..................................................................................... 41

    D.    Mag Instrument Inc. ............................................................................................. 52

III.    Additional Facts. ............................................................................................................. 57

PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS ................................... 69

IV.    Defendants Intended to and Did Directly Impact the Price of Physical Aluminum ......... 69

V.    Defendants' Conduct Broke the Manner in Which the LME Was Intended to Function ................................................................................................................................ 88

Pursuant to Local Rule 56.1, Defendants submit the following reply to Plaintiffs' responses to Defendants' statement of undisputed material facts and responses to Plaintiffs' statement of additional material facts.   Defendants' replies and responses below are provided solely for purposes of their Motion for Summary Judgment Against the FLPs' and IPs' Umbrella Claims ("Motion"), and are not concessions for any other purposes or concessions that any of Plaintiffs' purportedly material facts are relevant.   Defendants' failure to dispute any statement below is not an admission that may be used against them in other proceedings or at later stages of this proceeding.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

1.        During the period at issue, the FLPs and IPs collectively purchased approximately 549,000 metric tons of aluminum.  *See infra* ¶¶ 8, 34.

**Plaintiffs' (FLPs) Response**:  This figure is inaccurate for two reasons and irrelevant for one.   Plaintiffs purchased far more than 549,000 metric tons of aluminum during the damages period so the number is understated, however Plaintiffs only seek damages for first-level purchases from a producer, so to the extent that the number includes non-first-level purchases it overcounts, so is inaccurate and irrelevant for purposes of this motion.   It is unclear why Defendants decided to include certain non-first-level purchases in the Statement of Undisputed Material Facts ("SUMF") and Dr. Hausman's report and tables, particularly when they acknowledge in their n.5 that "[m]any of Plaintiffs' aluminum purchases were from fabricators and therefore were not first-level purchases from smelters."   To the extent that Dr. Hausman describes FLPs' first-level

---

[1]     **[FLPs & IPs]** Unless otherwise noted, citations are omitted and emphasis is added, here and throughout. All references to Exs. 1-74 are to the exhibits attached to the Declaration of John Playforth, dated September 2, 2020.  All references to Exs. 75-14 are to the exhibits attached to the Declaration of Patrick J. Coughlin, filed concurrently.  All references to Exs. IP-1-IP-28 are to the exhibits attached to the Declaration of Derek Y. Brandt, filed concurrently.

purchases for which FLPs seek damages, it is not accurate.  The total amount of first-level purchases for which Ampal seeks damages is correct.  The total amount of first-level purchases for which Claridge seeks damages is ███ metric tonnes – its purchases from Noranda.  The total amount of first-level purchases for which Custom seeks damages is ███ metric tonnes – its purchases from Noranda.  The total amount of first-level purchases for which Extruded seeks damages is ███ metric tonnes – its purchases from Noranda.  To the extent there is any dispute as to the estimated purchasing quantity, it is irrelevant to the legal issues raised by Defendants' motion.

**Plaintiffs' (IPs) Response:** IPs have no knowledge concerning FLPs' purchases, but respond to Defendants' factual assertions about IPs' own purchases for which they seek recovery below.  *See infra* Responses to ¶¶ 34, 35, 39, 43, 49.  To the extent there is any dispute as to the estimated purchasing quantity, it is irrelevant to the legal issues raised by Defendants' motion.

**Defendants' Reply:**  Plaintiffs agree that there are no material disputes of fact here.

2.    During the period at issue, no FLP or IP purchased any aluminum from any Defendant or alleged co-conspirator, with the sole exception of Ampal Inc. ("Ampal"), which purchased approximately 2,200 tons of aluminum from defendant Glencore Limited ("Glencore") and alleged co-conspirator Century Aluminum ("Century").[2]  *See infra* ¶¶ 7, 10–11, 34.

**Plaintiffs' Response**: For purposes of this motion, Plaintiffs agree with this statement.[3]

---

[2]   Defendant Glencore Ltd. held a minority stake in Century during the period in question.  Defendants believe that Plaintiffs have not adequately alleged that Century was a co-conspirator and in any event cannot show that Century (or Defendants) participated in any alleged conspiracy, but those issues are beyond the scope of Defendants' motion for summary judgment against the FLPs' and IPs' umbrella claims.

[3]   **[FLPs]** Plaintiffs disagree with Defendants' characterization of purchases from Century, but agree that this is outside the scope of this motion.

3.     As a result, more than 99 percent of the FLPs' and IPs' collective aluminum purchases were from entities that are neither defendants nor alleged co-conspirators.  *See infra* ¶¶ 8, 34.[4]

**Plaintiffs' (FLPs) Response**: FLPs agree that they are not seeking damages for "second-level" purchases of aluminum under the Sherman Act, and that they are irrelevant for purposes of deciding this motion. Plaintiffs dispute that the 99% figure is accurate given the number of second-level purchases that are included in the SUMF and Dr. Hausman's work, but in any event, the percentage is irrelevant as the numbers speak for themselves.

**Plaintiffs' (IPs) Response:** IPs have no knowledge concerning FLPs' purchases, but do not dispute the assertion that they did not purchase aluminum from any Defendant or alleged co-conspirator.  *See infra* Response to ¶ 34.

**Defendants' Reply:**   Plaintiffs agree that there is no material dispute of fact here. Defendants also note that, after excluding the second-level purchases for which the FLPs have clarified that they do not seek recovery, it remains correct that more than 99 percent of the FLPs' and IPs' collective aluminum purchases were from entities that are neither defendants nor alleged co-conspirators.   Specifically, 2,200 metric tons out of a total of approximately 435,800 tons (approximately ▮▮▮ metric tons for FLPs and approximately 342,000 metric tons for IPs) equals about 0.5 percent.

---

[4]   Many of Plaintiffs' aluminum purchases were from fabricators and therefore were not first-level purchases from smelters.  *See infra* ¶¶ 4, 31.  Claims based on such purchases have been dismissed from this litigation.  *See* Class Cert Order, ECF No. 1274, at 27; *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *22–23 (S.D.N.Y. 2014), *aff'd*, 833 F.3d 151 (2d Cir. 2016).  Defendants reserve all rights with respect to such purchases.

## I.      FLPs' Aluminum Purchases.

4.      During the class period, FLPs purchased most of their aluminum from producers or fabricators.  Ex. 1, Hausman Decl. ¶ 6 & tbls. 1–4; *see also* ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████.[5]

**Plaintiffs' (FLPs) Response**: The purchases for which Plaintiffs seek damages are first-level purchases from producers in the United States.  To the extent that Defendants have included contracts, testimony and data reflecting second-level purchases not made from producers, they are irrelevant for the purposes of this motion. The main large integrated producers that Plaintiffs purchased from were Alcoa, Alcan (Rio Tinto), Rusal, Century, and Noranda.

5.      The sellers from which FLPs purchased are known or identifiable.  Ex. 1, Hausman Decl. ¶ 6 & tbls. 1–4 (discussing the purchase data produced by Ampal, Claridge, Custom, and Extruded).

---

[5]   All references to "Ex." are to the exhibits attached to the Declaration of John S. Playforth, dated September 2, 2020.

**Plaintiffs' (FLPs) Response**: The sellers from which FLPs purchased are known or identifiable, though Defendants' SUMF and Dr. Hausman's Decl. includes irrelevant purchases and contracts under which Plaintiffs do not seek relief.

6.     FLPs allege that the parties that participated in the alleged conspiracy are Defendants, Burgess-Allen Partnership Ltd., Robert Burgess-Allen, Sierra Resources International, LLC, Max Sobol, Deutsche Bank, Red Kite, and Barclays Bank.  *See* Ex. 6, FLPs' Resps. & Objs. to Contention Interrogs. at 6.

**Plaintiffs' (FLPs) Response**: The full text of the substance of FLPs' response to Contention Interrogatory No. 1 is:

> Subject to the foregoing, and based on the discovery taken to date, FLPs contend the following persons "participated in the conspiracy:" Goldman Sachs & Co.; J. Aron Company; Goldman Sachs International; Metro International Trade Services LLC; MITSI Holdings LLC; Burgess-Allen Partnership Ltd.; Robert Burgess-Allen; JPMorgan Chase Bank, N.A.; JPMorgan Securities, plc; Henry Bath & Son, Ltd.; Henry Bath, LLC; Sierra Resources International, LLC; Max Sobol; Glencore International AG; Glencore AG; Glencore Ltd.; Pacorini Metals AG; Pacorini Metals Vlissingen B.V.; Pacorini Metals USA, LLC; Deutsche Bank; Red Kite; and Barclays Bank.  FLPs also contend the following natural persons, who were employed by one of the Defendants or acted as an agent thereof, participated in the conspiracy: Isabelle Ealet, Greg Agran, Stephen Branton-Speak, Jacques Gabillon, Ingmar Grebien, Chris Wibbelman, Michael Whelan, Mark Askew, Robert Burgess-Allen, Leo Prichard, Blythe Masters, Michael Camacho, Peter Sellars, Neil Clift, Simon (Sam) Hainsworth, Martin Stanley, Graham Hawkins, Gary Fegel, Daniel Goldberg, Robin Scheiner, Marc Kremer, Matthew Lucke, Patrick Wilson, Tony DiCenso, Ravi Ramaiah, Peter Waszkis, Geoff Reaeaux, Gary Kalmin, Sergio Garbin, Simon Yntema, Mario Casciano, Evan Richards, Barry Feldman and Stephen Upot.

Ex. 6 at 60.

7.     With the exception of limited purchases by Ampal from Glencore and Century (*see infra* ¶ 10), FLPs did not purchase primary aluminum from any Defendant or alleged co-conspirator in this action (*see infra* ¶¶ 11, 17, 22, 28).

**Plaintiffs' (FLPs) Response**: FLPs do not dispute this fact for purposes of this motion.

8.      Collectively, FLPs purchased approximately 208,000 metric tons of aluminum, of which approximately 2,200 metric tons—approximately 1 percent—was purchased from a Defendant or alleged co-conspirator. *See infra* ¶¶ 9–10, 16, 21, 27.

**Plaintiffs' (FLPs) Response**: FLPs made approximately ▬▬ metric tons of first-level purchases of primary aluminum from producers during the damages period.  Approximately ▬▬ metric tons of that was purchased from a Defendant or alleged co-conspirator.  Plaintiffs are not seeking damages for non-first-level purchases of aluminum under the Sherman Act, and they are irrelevant for purposes of deciding this motion.  Plaintiffs dispute that the 1% figure is accurate given the number of non-first-level purchases that are included in the SUMF and Dr. Hausman's work, but in any event, the percentage is irrelevant as the numbers speak for themselves.

**Defendants Reply:**  FLPs have clarified that they seek damages for only ▬▬ metric tons of purchases.  Accordingly, approximately ▬▬ of the purchases for which FLPs seek damages—2,200 out of ▬▬ metric tons—were purchased from a Defendant or alleged co-conspirator.

### A.      Ampal Inc.

9.      From February 1, 2010, through March 25, 2016, Ampal claims to have purchased approximately ▬▬ metric tons of aluminum.  *See* Ex. 6, FLPs' Resps. & Objs. to Contention Interrogs. at 9 (June 10, 2016) (identifying Ampal purchases for which damages are sought); Ex. 1, Hausman Decl. ¶ 6 & tbl. 1 (summarizing Ampal purchase data produced at AMPAL0000560).

**Plaintiffs' (FLPs) Response**: The Ampal purchase data in Ex. 87, AMPAL0000560 is accurately reflected in Hausman Table 1.

10.      During this period, Ampal claims to have purchased approximately 2,200 metric tons of aluminum, or around ▬▬ of its total aluminum purchases, from Glencore or Century.

*See* Ex. 1, Hausman Decl. ¶ 6 & tbl. 1 (summarizing Ampal purchase data produced at AMPAL0000560).

  **Plaintiffs' (FLPs) Response**: The Ampal purchase data in Ex. 87, AMPAL0000560 is accurately reflected in Hausman Table 1. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

  11. From February 1, 2010, through March 25, 2016, Ampal did not purchase aluminum from any Defendant or alleged co-conspirator other than Glencore and Century.  Ex. 1, Hausman Decl. ¶ 6 & tbl. 1; *see also* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮

  **Plaintiffs' (FLPs) Response**: The Ampal purchase data in Ex. 87, AMPAL0000560 is accurately reflected in Hausman Table 1.

  12. Ampal's aluminum purchases include purchases that were made pursuant to fixed-price contracts, without a floating Midwest Premium or Midwest Transaction Price component.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

  **Plaintiffs' (FLPs) Response**: Regardless of the style of contract entered into, on all its first-level purchases of aluminum, Ampal paid the Midwest Premium ("MWP") and the London Metal Exchange ("LME") price for aluminum.  Even if the contract does not contain an explicit

MWP term, the MWP is included in the purchase price, every time.  This is confirmed by Ampal's

deposition testimony.  *See*, *e.g.*,

- Ex. 88 (Ramsey Dep. Tr.) at 35:8-19



- *Id.* at 36:10-13

- *Id.* at 36:19-37:2

- *Id.* at 68:22-69:2

- *Id.* at 69:11-17

- *Id.* at 73:12-21

- *Id.* at 74:15-17

- *Id.* at 95:14-96:11

- *Id.* at 109:15-20 ████████████████████
████████████████████████████████████

Further, each contract that the Defendants cite reflect that the full MWP was paid, as described in Ex. 75 (Vazquez Decl.) at 16:

- **Exhibit 7, AMPAL000012-20**, is a series of contracts which appear to be produced from a hardcopy file.





- **Exhibit 8, AMPAL000089**, is a contract



[6]   **[FLPs]**

[7]   **[FLPs]**



- **Exhibit 9, AMPAL0016577**, is a contract is a contract



**Defendants' Reply:**  FLPs have not disputed that Ampal's aluminum purchases include purchases under fixed-price contracts that make no reference to the Midwest Premium or Midwest Transaction Price.  Instead, FLPs indirectly admit that some of Ampal's contracts "do[] not contain an explicit MWP term."

FLPs also assert the separate proposition that "[e]ven if the contract does not contain an explicit MWP term, the MWP is included in the purchase price, every time."  That ambiguous statement appears to be FLPs' subjective characterization of the purchase prices paid by Ampal rather than an objective statement of fact about those purchase prices.  It is also irrelevant.  Neither FLPs' characterization of Ampal's purchase prices nor the evidence cited in support of that characterization establishes that an increase in the Midwest Premium would directly, automatically, or unavoidably result in an increase in the all-in purchase prices paid by Ampal.  To the contrary, the Vazquez Declaration attached as Plaintiffs' Exhibit 75 confirms that ▌

Ex. 75, Vazquez Decl.

at 16–19. Mr. Vazquez and the FLPs offer unsubstantiated speculation that the difference should be assumed away as an "Alcan margin" or a "likely upcharge for immediate delivery" (*id.*), but they do not claim that any such "margins" or "upcharges" were fixed or non-negotiable.

13.    Ampal's purchases include spot purchases made without a written contract containing a floating Midwest Premium or Midwest Transaction Price component. 

**Plaintiffs' (FLPs) Response**: Spot purchases made by Ampal, or purchases made pursuant to contracts that were not long-term contracts, always included the MWP. This is confirmed by Ampal's deposition testimony. *See*, *e.g.*,

- Ex. 88 (Ramsey Dep. Tr.) at 37:16-23 ████████████████████████

  ████████████████████████ and

- *Id.* at 47:7-11 ████████████████████████

  ████████████████

Further, there is no such thing as an aluminum purchase made without a contract, which is "[a]n agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law." Contract, Black's Law Dictionary (11th ed. 2019). *See* Ex. 88 (Ramsey Dep. Tr.) at 66:5-67:4 ████████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████████████████████████████

████████████████ Defendants' suggestion that a purchase was made pursuant to a phantom contract leaves out the second half of the sentence: ████████████████ *Id.*

**Defendants' Reply:** FLPs have not disputed that Ampal's purchases include spot purchases made without a written contract containing a floating Midwest Premium or Midwest Transaction Price component. Although FLPs assert the separate proposition that Ampal made spot purchases pursuant to "verbal contract[s]" that in some undefined way were "based on" the MWTP, that assertion is irrelevant. It does not establish that an increase in the Midwest Premium would directly, automatically, or unavoidably result in an increase in the all-in purchase prices paid by Ampal.

14.    Ampal was able to, and did, enter into transactions that had the effect of hedging future changes in the Midwest Premium. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

**Plaintiffs' (FLPs) Response**: Defendants' statement is misleading. Plaintiffs could not "hedge" or "fix" the MWP, only the LME price could be hedged.

**Defendants' Reply:** FLPs have not disputed the fact submitted by Defendants and fail to cite any evidence to support their alternative statement that "Plaintiffs could not 'hedge' or 'fix' the MWP." Furthermore, it is beyond genuine dispute that exposure to the MWP can be hedged

or limited, ████████████████████████████████████████

████████████████████████████████████████████

15.     Ampal was able to, and did, negotiate with aluminum producers and suppliers as to

price. ██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

**Plaintiffs' (FLPs) Response**: The negotiations that are referred to here are as to shape,

purity, location, cash payment, and delivery method, and do not ever refer to a negotiation of the

Midwest Premium. This is confirmed by Ampal:

- Ex. 88 (Ramsey Dep. Tr.) at 35:24-36:7
  ████████████████████████████
  ████████████████████████████
  ██████████

- *Id.* at 65:5-20
  ████████████████████████████
  ████████████████████████████
  ████████████████████████████
  ████████████████████████████
  ██████████████████████

- *Id.* at 122:15-123:13
  ████████████████████████████
  ████████████████████████████
  ████████████████████████████
  ████████████████████████████
  ████████████████████████████
  ████████████████████████████
  ██████████████

- *Id.* at 129:11-19
  ████████████████████████████
  ████████████████████████████
  ████████████████████████████
  ████████████████████████████



- *Id.* at 130:4-8

- *Id.* at 132:14-19

- *Id.* at 133:17-25

**Defendants' Reply:**  FLPs have not disputed that Ampal was able to, and did, negotiate with aluminum producers and suppliers as to price.  Although FLPs assert the separate proposition that these negotiations "are as to shape, purity, location, cash payment, and delivery method," that proposition is not supported by their evidence.  That assertion is also irrelevant because it does not dispute or deny that all-in prices are negotiable or that increases in one price component could be offset by reductions in another.

**B.      Claridge Products and Equipment, Inc.**

16.      From February 1, 2010, through March 25, 2016, Claridge Products and Equipment, Inc. ("Claridge") claims to have purchased approximately ███ metric tons of aluminum. Ex. 6, FLPs' Resps. & Objs. to Contention Interrogs. at 9 (June 10, 2016) (identifying Claridge purchases for which damages are sought); Ex. 1, Hausman Decl. ¶ 6 & tbl. 2 (summarizing Claridge purchase data produced at CLARIDGE0026501).

**Plaintiffs' (FLPs) Response**: The purchases from which Plaintiffs seek damages are first-level purchases from producers.  To the extent that Defendants have included contracts, testimony and data reflecting second-level purchases not made from producers, they are irrelevant for the purposes of this motion.  Claridge made first-level purchases of ███ metric tons from producers during the damages period.

17.     From February 1, 2010, through March 25, 2016, Claridge did not purchase any aluminum from any Defendant or alleged co-conspirator.  Ex. 1, Hausman Decl. ¶ 6 & tbl. 2 (summarizing Claridge purchase data produced at CLARIDGE0026501); ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████

**Plaintiffs' (FLPs) Response**: Plaintiffs have not disputed that Claridge did not purchase any aluminum from any Defendant or alleged co-conspirator.

18.     In order to "hedge the price of aluminum," Claridge entered into fixed-forward sales made pursuant to contracts or agreements without a floating Midwest Premium or Midwest Transaction Price component. ███████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████

**Plaintiffs' (FLPs) Response**: Defendants' statement is misleading.  Plaintiffs could not "hedge" or "fix" the MWP, only the LME Price could be hedged.   Claridge does not seek damages for the contract with Sapa, so the citation to that contract is irrelevant for purposes of this motion. The MWP was paid on all first-level purchases of aluminum from producers by Claridge.  Ex. 92 (Hardcastle Dep. Tr.) at 170:19-24 ████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████ The contract with Noranda is a partially executed forward metal buy agreement.  It does not reflect any purchases of aluminum and is irrelevant for purposes of this motion.

**Defendants' Reply:**  FLPs have not disputed that Claridge's aluminum purchases include fixed-forward purchases made pursuant to contracts that make no reference to the Midwest Premium or Midwest Transaction Price.  It is likewise beyond genuine dispute that if the all-in price is fixed for a period of time, the MWP is thereby fixed or hedged.

FLPs assert the separate proposition that "[t]he MWP was paid on all first-level purchases of aluminum from producers by Claridge."  That ambiguous statement appears to be a subjective characterization of the purchase prices paid by Claridge rather than an objective statement of fact about those purchase prices.  It is also irrelevant.  Neither FLPs' characterization of Claridge's purchase prices nor the evidence cited in support of that characterization establishes that an increase in the Midwest Premium would directly, automatically, or unavoidably result in an increase in the all-in purchase prices paid by Claridge.  Plaintiffs' Exhibit 92 does not purport to dispute the existence of fixed-forward purchases made under contracts that did not contain a Midwest Premium or Midwest Transaction Price term.

19.   Claridge  aluminum on a spot basis, without a written contract containing a floating Midwest Premium or Midwest Transaction Price component.

**Plaintiffs' (FLPs) Response**: Spot purchases made by Claridge, or purchases made pursuant to contracts that were not long-term contracts, always included the MWP.  Ex. 92 (Hardcastle Dep. Tr.) at 170:19-24

██████████████████████████   Claridge does not seek damages for the contract with

Hydro, so it is irrelevant for purposes of this motion.  Further, there is no such thing as an aluminum

purchase made without a contract, which is "[a]n agreement between two or more parties creating

obligations that are enforceable or otherwise recognizable at law."   Contract, Black's Law

Dictionary (11th ed. 2019).

**Defendants' Reply:**   FLPs have not disputed that Claridge's purchases include spot

purchases made without a written contract containing a floating Midwest Premium or Midwest

Transaction Price component.  Instead, they implicitly admit that they made such spot purchases,

but assert the separate proposition that those purchases "always included the MWP."   That

ambiguous statement appears to be a subjective characterization of the spot purchase prices paid

by Claridge rather than an objective statement of fact about those prices.  It is also irrelevant.  It

does not establish that an increase in the Midwest Premium would directly, automatically, or

unavoidably result in an increase in the all-in prices paid by Claridge.

20.     Claridge was able to, and did, negotiate with aluminum producers and suppliers as

to price.  ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

**Plaintiffs' (FLPs) Response**: The negotiations that are referred to here are as to shape,

purity, location, cash payment, and delivery method, and do not ever refer to a negotiation of the

Midwest Premium.  Ex. 92 (Hardcastle Dep. Tr.) at 85:17-86:3 ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

**Defendants' Reply:**  FLPs have not disputed that Claridge was able to, and did, negotiate with aluminum producers and suppliers as to price.  Although FLPs assert the separate proposition that these negotiations "are as to shape, purity, location, cash payment, and delivery method," that proposition is not supported by their evidence.  That assertion is also irrelevant because it does not dispute or deny that all-in prices are negotiable or that increases in one price component could be offset by reductions in another.

### C. Custom Aluminum Products, Inc.

21.     From February 1, 2010, through March 25, 2016, Custom Aluminum Products, Inc. ("Custom") claims to have purchased approximately ███ metric tons of aluminum.  Ex. 6, FLPs' Resps. & Objs. to Contention Interrogs. at 9 (June 10, 2016) (identifying Custom purchases for which damages are sought); Ex. 1, Hausman Decl. ¶ 6 & tbl. 3 (summarizing Custom purchase data produced at CUSTOM0000063).

**Plaintiffs' (FLPs) Response**: The purchases from which Plaintiffs seek damages are first-level purchases from producers.  To the extent that Defendants have included contracts, testimony and data reflecting second-level purchases not made from producers, they are irrelevant for the purposes of this motion.  Custom made first-level purchases of ███ metric tons from Noranda during the damages period.

22.     From February 1, 2010, through March 25, 2016, Custom did not purchase any aluminum from any Defendant or alleged co-conspirator.  Ex. 1, Hausman Decl. ¶ 6 & tbl. 3 (summarizing Custom purchase data produced at CUSTOM0000063); ████████████

████████████████████████████████████████

**Plaintiffs' (FLPs) Response**: Plaintiffs have not disputed that Custom did not purchase any aluminum from any Defendant or alleged co-conspirator.

23.    Custom made some of its aluminum purchases pursuant to fixed-price contracts, without a floating Midwest Premium or Midwest Transaction Price component. ███████████

████████████████████████████████████████████████████████

████████████████

**Plaintiffs' (FLPs) Response**: Regardless of the style of contract entered into, on all its first-level purchases of aluminum, Custom paid the MWP and the LME price for aluminum. Custom does not seek damages for the contracts cited by Defendants, so those citations are irrelevant for purposes of this motion.  In any event, even if a contract does not contain an explicit MWP term, the MWP is included in the purchase price, every time.  This is confirmed by Custom's deposition testimony.  Ex. 93 (Dillet Dep. Tr.) at 98:19-24 ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

**Defendants' Reply:**  FLPs have not disputed that Custom's aluminum purchases include purchases under fixed-price contracts that make no reference to the Midwest Premium or Midwest Transaction Price.  Instead, FLPs indirectly admit that some of Custom's contracts "do[] not contain an explicit MWP term."

FLPs also assert the separate proposition that "[e]ven if the contract does not contain an explicit MWP term, the MWP is included in the purchase price, every time."  That ambiguous statement appears to be a subjective characterization of the purchase prices paid by Custom rather

than an objective statement of fact about those purchase prices.  It is also irrelevant.  Neither FLPs'

characterization of Custom's purchase prices nor the evidence cited in support of that

characterization establishes that an increase in the Midwest Premium would directly,

automatically, or unavoidably result in an increase in the all-in purchase prices paid by Custom.

Plaintiffs' Exhibit 93 does not purport to dispute the existence of fixed-price purchases made under

contracts that did not contain a Midwest Premium or Midwest Transaction Price term.

24.    Custom entered into spot purchases that were made without a written contract

containing a Midwest Premium or Midwest Transaction Price component.  

Custom was able to, and did, negotiate the terms of spot

purchases.

**Plaintiffs' (FLPs) Response**: Spot purchases made by Custom, or purchases made

pursuant to contracts that were not long-term contracts, always included the MWP.  Further, there

is no such thing as an aluminum purchase made without a contract, which is "[a]n agreement

between two or more parties creating obligations that are enforceable or otherwise recognizable at

law."  Contract, Black's Law Dictionary (11th ed. 2019).  Custom paid the MWP on spot

purchases.  *See* Ex. 93 (Dillett Dep. Tr.) at 157:19-24

**Defendants' Reply:**  FLPs have not disputed that Custom's purchases include spot

purchases made without a written contract containing a floating Midwest Premium or Midwest

Transaction Price component.  Instead, they implicitly admit that they made such spot purchases,

but assert the separate proposition that those purchases "always included the MWP."  That

ambiguous statement appears to be a subjective characterization of the spot purchase prices paid

by Custom rather than an objective statement of fact about those purchase prices.  It is also irrelevant.  It does not establish that an increase in the Midwest Premium would directly, automatically, or unavoidably result in an increase in the all-in purchase prices paid by Custom.

25.   Custom was able to, and did, enter into contracts on behalf of customers hedging the Midwest Premium. ███████████████████████████████████████████████████
█████████████████████████████████████

**Plaintiffs' (FLPs) Response**: Defendants' statement is misleading.  Plaintiffs could not "hedge" or "fix" the MWP, only the LME price could be hedged.  Custom did not negotiate the MWP. *See* Ex. 93 (Dillett Dep. Tr.) at 170:10-171:7 ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

[REDACTED]

[REDACTED]

**Defendants' Reply:**  FLPs do not cite any evidence giving rise to a dispute of fact that Custom could, and in fact did, hedge the all-in price of aluminum.  The evidence cited by FLPs instead offers further confirmation of this fact, stating that [REDACTED]

[REDACTED]

[REDACTED] Ex. 93, Custom 30(b)(6) (Dillett) Dep. at 27.  It is beyond genuine dispute that if the all-in price is fixed for a period of time, the MWP is thereby fixed or hedged. To the extent that the FLPs' statement that "Plaintiffs could not 'hedge' or 'fix' the MWP, only the LME price could be hedged" is intended as a statement of fact rather than a subjective characterization of the purchase price, the FLPs offer no evidence that supports any such fact.

26.     Custom was able to, and did, negotiate with suppliers as to price. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

**Plaintiffs' (FLPs) Response**: The negotiations that are referred to here are as to shape, purity, location, cash payment, and delivery method, and do not ever refer to a negotiation of the MWP.  Ex. 93 (Dillet Dep. Tr.) at 108:7-23 [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

████████████████████████████████████████████████████

████████████████████████████

**Defendants' Reply:**  FLPs have not disputed that Custom was able to, and did, negotiate with aluminum producers and suppliers as to price.  Although FLPs assert that these negotiations "are as to shape, purity, location, cash payment, and delivery method," that proposition is not supported by their evidence.  That assertion is also irrelevant because it does not dispute or deny that all-in prices are negotiable or that increases in one price component could be offset by reductions in another.

    **D.**     **Extruded Aluminum, Inc.**

27.    From February 1, 2010, through March 25, 2016, Extruded Aluminum, Inc. ("Extruded") claims to have purchased approximately ████ metric tons of aluminum.  *See* Ex. 6, FLPs' Resps. & Objs. to Contention Interrogs. at 9 (June 10, 2016) (identifying Extruded purchases for which damages are sought); Ex. 1, Hausman Decl. ¶ 6 & tbl. 4 (summarizing Extruded purchase data produced at EXTRUDED0005014).

**Plaintiffs' (FLPs) Response**: The purchases from which Plaintiffs seek damages are first-level purchases from producers.  To the extent that Defendants have included contracts, testimony and data reflecting second-level purchases not made from producers, they are irrelevant for the purposes of this motion.  Extruded made first-level purchases of ████ metric tons from Noranda during the damages period.

28.    From February 1, 2010, through March 25, 2016, Extruded did not purchase any aluminum from any Defendant or alleged co-conspirator. Ex. 1, Hausman Decl. ¶ 6 & tbl. 4; ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

**Plaintiffs' (FLPs) Response**: Plaintiffs have not disputed that Extruded did not purchase any aluminum from any Defendant or alleged co-conspirator.  Defendants' citation ignores that Dr. Hausman, identifies several additional sources of purchases for Extruded, however they are irrelevant for purposes of this motion.

29.    Extruded's aluminum purchases include purchases that were made pursuant to fixed-price contracts, without a floating Midwest Premium or Midwest Transaction Price component. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████

**Plaintiffs' (FLPs) Response**: Regardless of the style of contract entered into, on all its first-level purchases of aluminum, Extruded paid the MWP and the LME price for aluminum.  Custom does not seek damages for the contracts cited by Defendants, so those citations are irrelevant for purposes of this motion.  However, even if a contract does not contain an explicit MWP term, the MWP is included in the purchase price, every time.  This is confirmed by Extruded's deposition testimony.  Ex. 94 (Hall Dep. Tr.) at 67:6-15 ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

**Defendants' Reply:**  FLPs have not disputed that Extruded's aluminum purchases include purchases under fixed-price contracts that make no reference to the Midwest Premium or Midwest Transaction Price.  Instead, they indirectly admit that some of Extruded's contracts "do[] not contain an explicit MWP term."

FLPs also assert the separate proposition that "[e]ven if the contract does not contain an explicit MWP term, the MWP is included in the purchase price, every time."  That ambiguous statement appears to be a subjective characterization of the purchase prices paid by Extruded rather than an objective statement of fact about those purchase prices.  It is also irrelevant.  Neither FLPs'

characterization of Extruded's purchase prices nor the evidence cited in support of that characterization establishes that an increase in the Midwest Premium would directly, automatically, or unavoidably result in an increase in the all-in purchase prices paid by Extruded. Plaintiffs' Exhibit 94 does not dispute the existence of fixed-price purchases made under contracts that did not contain a Midwest Premium or Midwest Transaction Price term.

30.    Extruded was able to, and did, negotiate with aluminum sellers as to price. █████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████

**Plaintiffs' (FLPs) Response**:  The negotiations that are referred to here are as to shape, purity, location, cash payment, and delivery method, and do not ever refer to a negotiation of the MWP.  Further, the purchases to which Defendants refer to are not first-level purchases from producers, so they are irrelevant for purposes of this motion.  Extruded did not negotiate the MWP. Ex. 94 (Hall Dep. Tr.) at 204:23-205:4 ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

**Defendants' Reply:**  FLPs have not disputed that Extruded was able to, and did, negotiate with aluminum producers and suppliers as to price.  Although FLPs assert that these negotiations "are as to shape, purity, location, cash payment, and delivery method," that proposition is not supported by their evidence.  That assertion is also irrelevant because it does not dispute or deny that all-in prices are negotiable or that increases in one price component could be offset by reductions in another.

## II.     IPs' Aluminum Purchases.

31.     During the period in suit by the IPs, the IPs purchased all of their aluminum from producers or fabricators.  Ex. 1, Hausman Decl. ¶ 7 & tbls. 5–8; *see also* ██████████████

███████████████████████████████████████████████████████

███████████████████████████[8] ; ██████████████████████████████████
[5]

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████

**Plaintiffs' (IPs) Response**:  There is no dispute that the relevant suppliers are identified. To the extent any supplier was not an integrated aluminum producer, IPs by contract nonetheless paid the relevant regional premium for the purchases in question, as further demonstrated below.

---

[8]    Bridgnorth, a UK supplier, also supplied a small amount of lithographic coil to Agfa's Branchburg, New Jersey facility.  *See* Ex. 1, Hausman Decl. ¶ 7 & tbl. 5 (summarizing transactional data produced at AGFA_004647).

32.     The sellers from which IPs purchased are known or identifiable.  *See* Ex. 1,
Hausman Decl. ¶ 7 & tbls. 5–8 (discussing the purchase data produced by Agfa, Fuji, Kodak, and
Mag).

**Plaintiffs' (IPs) Response**:  No dispute.

33.     The IPs allege that the parties that participated in the alleged conspiracy are
Defendants, Burgess-Allen Partnership Ltd., Sierra Resources International, LLC, Deutsche Bank
AG, Deutsche Bank Energy Trading LLC, "other Deutsche Bank entities," Red Kite Capital
Management LLP, Red Kite Group, and "other Red Kite entities."  *See* Ex. 32, Agfa's Resps. &
Objs. to Contention Interrogs. at 4–6; Ex. 33, Fujifilm's Resps. & Objs. to Contention Interrogs.
at 4–6; Ex. 34, Kodak's Resps. & Objs. to Contention Interrogs. at 4–6; Ex. 35, Mag's Resps. &
Objs. to Contention Interrogs. at 4–6.

**Plaintiffs' (IPs) Response**:  IPs also identify as conspirators or participants several of
Defendants' affiliates and a number of Defendants' employees who are not listed above, as further
described in Playforth Exs. 32, 33, 34, and 35.  IPs believe that any dispute is irrelevant to the legal
issues raised by Defendants' motion.

34.     Collectively, the IPs purchased approximately 342,000 metric tons of aluminum,
none of which was purchased from a Defendant or alleged co-conspirator.  *See infra* ¶¶ 35–36,
39–40, 43–44, 49–50.

**Plaintiffs' (IPs) Response**:  No dispute as to this estimate, and no dispute that IPs did not
purchase aluminum from a Defendant or alleged co-conspirator.  To the extent IPs' exact combined
purchase quantity differs from this estimate, the dispute is irrelevant to the legal issues raised by
Defendants' motion.  *See infra* Responses to ¶¶ 35–36, 39–40, 43–44, 49–50.

## A.      Agfa Corp. and Agfa Graphics N.V.

35.      From January 1, 2010, through June 30, 2015, Agfa Corporation[9] claims to have purchased approximately ▮▮▮▮ metric tons of aluminum for its Branchburg, New Jersey facility.[10]  *See* Ex. 32, Agfa's Resps. & Objs. to Contention Interrogs. at 9–10; Ex. 1, Hausman Decl. ¶ 7 & tbl. 5 (summarizing transactional data produced at AGFA_004674).

**Plaintiff's (Agfa) Response**:  According to Plaintiff's calculations, this is approximately the amount of aluminum Agfa purchased for delivery to its US locations from January 1, 2010 to June 30, 2015.[11]  To the extent Agfa's exact purchase quantity differs from this estimate, the dispute is irrelevant to the legal issues raised by Defendants' motion.

36.      From January 1, 2010, through June 30, 2015, Agfa did not purchase any aluminum from any Defendant or alleged co-conspirator.  Ex. 1, Hausman Decl. ¶ 7 & tbl. 5 (summarizing Agfa purchase data produced at AGFA_0004674, 0076407–08 & 0200801); ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[9]    Agfa Graphics, N.V. is the parent corporation of Agfa Corporation.  Agfa Corporation supplies Agfa Graphics' products to the U.S. market.  *See* Ex. 28, Agfa 30(b)(6) (Pellegroms) Dep. at 29–30.  Defendants refer to these two entities together as "Agfa."

[10]    Agfa's Branchburg, New Jersey facility was the only Agfa facility in the United States that bought aluminum, in the form of lithographic coil, during the relevant period.  *See* Ex. 28, Agfa 30(b)(6) (Pellegroms) Dep. at 84–85.  During the relevant period, Agfa also purchased lithographic coil at its facilities in Germany, the United Kingdom, Italy, South Korea, Brazil, and China.  *See id.* at 19–20, 82–84, 87–89.  Defendants contend that any claims based on Agfa's foreign purchases are barred by the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. §6a, and reserve all defenses with respect to such purchases.  For purposes of the present motion, however, the relevant fact is none of Agfa's purchases—foreign or domestic—was made from any defendant or alleged co-conspirator.  *See infra* ¶ 36.

[11]    **[Agfa Resp.]** There is no dispute that Agfa also purchased aluminum for delivery to non-U.S. locations. Defendants have not moved to exclude those purchases, so the issue is irrelevant and/or not material to this motion. It is undisputed that Agfa did not purchase from any defendant or alleged co-conspirator. *See infra* Response to ¶ 36.

████████████████████████████████████████████████

████████████████

**Plaintiff's (Agfa) Response**:  No dispute.

37.     Many of Agfa's purchase contracts lacked any Midwest Transaction Price and/or Midwest Premium term, instead incorporating European premium terms.  ████████████

████████████████████████████████████████████████

████████████████████████

**Plaintiff's (Agfa) Response**:  It is not disputed that some or all of Agfa's aluminum procurements for delivery to the United States from European suppliers incorporate European premium terms.  There is no basis to exclude those purchases from this action and Defendants have not moved for such relief.  Accordingly, the distinction between the Midwest Transaction Price and/or Midwest Premium and the European premium is immaterial for purposes of this motion. For completeness, however, all Agfa aluminum supply agreements during the time in question include applicable regional premium pricing terms—including either the Midwest Transaction Price, Midwest Premium, or European premium.  Ex. IP-1 ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

███████████████████████████████████████████

███████████████████████████████████████████ Those

contracts specify that █████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████ Other Agfa supply agreements ██

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

38.     Agfa was able to, and did, negotiate with aluminum producers and suppliers as to

price. ██████████████████████████████████████

---

[12]  **[Agfa Resp.]** Hedging and forward-buying lock only the LME price portion of the aluminum cost, and not the premium.  Pellegroms Dep. at 301:11-302:22.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

**Plaintiff's (Agfa) Response**:   It is not disputed that Agfa negotiated with aluminum

suppliers, but ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

**Defendants' Reply:**  Agfa has not disputed that it was able to, and did, negotiate with aluminum producers and suppliers as to price.  Instead, Agfa admits and cites to evidence that a number of its purchase contracts contained negotiated discounts such as volume rebates.

███████████████████████████████████████   Although Agfa asserts that "the portions of

its procurements which were subject to negotiation were limited to the conversion costs and the

transport costs," that proposition is not supported by its evidence.  That assertion is also irrelevant

because it does not dispute or deny that all-in prices are negotiable or that increases in one price

component could be offset by reductions in another.

**B.      Fujifilm Manufacturing U.S.A., Inc.**

39.      From January 1, 2010, through June 30, 2015, Fujifilm Manufacturing U.S.A., Inc.

("Fuji") claims to have purchased approximately ████████ metric tons of aluminum.  *See* Ex. 33,

Fuji's Resps. & Objs. to Contention Interrogs. at 9–10 (June 10, 2016) (identifying Fuji purchases

for which damages are sought); Ex. 1, Hausman Decl. ¶ 7 & tbl. 6 (summarizing Fuji purchase

data produced at FUJIFILM_000523–000526, FUJIFILM_069466).

**Plaintiff's (Fujifilm) Response**:      According to Plaintiff's calculations, this is

approximately the amount of aluminum Fujifilm purchased for delivery to its US locations from

January 1, 2010 to June 30, 2015.  To the extent Fujifilm's exact purchase quantity differs from

this estimate, the dispute is irrelevant to the legal issues raised by Defendants' motion.

40.      From January 1, 2010, through June 30, 2015, Fuji did not purchase any aluminum

from any Defendant or alleged co-conspirator.  *See* Ex. 1, Hausman Decl. ¶ 7 & tbl. 6

(summarizing Fuji purchase data produced at FUJIFILM_000523–000526, FUJIFILM_069466);

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

**Plaintiff's (Fujifilm) Response**:  No dispute.

41.     Many of Fuji's purchase contracts lacked any Midwest Transaction Price and/or Midwest Premium term, instead incorporating European premium terms. ███████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████

**Plaintiff's (Fujifilm) Response**:  It is not disputed that some or all of Fujifilm's aluminum procurements for delivery to the United States from European suppliers incorporate European premium terms.  There is no basis to exclude those purchases from this action and Defendants have not moved for such relief.  Accordingly, the distinction between the Midwest Transaction Price and/or Midwest Premium and the European premium is immaterial for purposes of this motion.  For completeness, however, all of Fujifilm's aluminum purchase contracts for delivery to the US included a mandatory regional premium; either the Midwest Premium or the Rotterdam Premium (also referred to as European Community Duty Paid or Duty Unpaid Premium).  Ex. IP-8 ███████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████  Fujifilm claims damages for purchases pursuant to contracts that incorporated either the Midwest Premium or the Rotterdam Premium.  *See* Ex. 33, Fuji's Resps. & Objs. To Contention Interrogs. at 9 ("Plaintiff seeks recovery in this action for every purchase of LME-priced aluminum that it made (a) for which it paid a regional premium (b) during the time period within which the applicable regional premiums were inflated by Defendants' conduct as alleged in the action.").

Many of Fujifilm's purchase contracts ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Fujifilm's contracts ███████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

From January 1, 2010 through June 30, 2015, Fujifilm purchased approximately ████

metric tons of aluminum that was priced using the Midwest Transaction Price, which included the

Midwest premium.  Ex. 1, Hausman Decl. Table 6.

Fujifilm's other purchase contracts ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████



Fujifilm's purchases

Fujifilm's purchases

[13]

**Defendants' Reply:** Fuji has not disputed that many of its purchase contracts included the Midwest Transaction Price as opposed to the Midwest Premium. Defendants agree that the difference between the Rotterdam Premium and the Midwest Premium is beyond the scope of this

[13]

motion and thus should be treated as immaterial solely for purposes of this motion. ██████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

     42.    Fuji was able to, and did, negotiate with aluminum producers and suppliers as to

price. ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

**Plaintiff's (Fujifilm) Response**: ████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

Defendants citation to ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████

**Defendants' Reply:**  Fuji has not disputed that it was able to, and did, negotiate with aluminum producers and suppliers as to price.  Instead, Fuji admits and cites to evidence that █

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  Although Fuji

asserts that it ██████████████████████████████  that proposition is not supported by its

evidence.  That assertion is also irrelevant because it does not dispute or deny that all-in prices are

negotiable or that increases in one price component could be offset by reductions in another.

### C.   Eastman Kodak Company

43.    From January 1, 2010, through June 30, 2015, Eastman Kodak Company

("Kodak") claims to have purchased approximately ██████ metric tons of aluminum for delivery

to its plants located in the United States.  *See* Ex. 34, Kodak's Resps. & Objs. to Contention

Interrogs. at 9–10 (June 10, 2016) (identifying Kodak purchases for which damages are sought);

ECF No. 1192, Stipulation and Order Regarding Dismissal of Certain Claims Without Prejudice

("[T]he parties . . . stipulate and agree that the claims related to Kodak's [purchases for delivery

to its plants located outside the U.S.] . . . are hereby dismissed without prejudice to their re-

assertion in tribunals outside the United States."); Ex. 1, Hausman Decl. ¶ 7 & tbl. 7 (summarizing Kodak purchase data produced at KODAK_001384–001390).

**Plaintiff's (Kodak) Response**:  According to Plaintiff's calculations, Kodak purchased approximately ███████ metric tons of aluminum for delivery to its US locations from January 1, 2010 to June 30, 2015.  While this number differs slightly from Defendants' contention, the dispute is irrelevant to the legal issues raised by Defendants' motion.

44.   From January 1, 2010, through June 30, 2015, Kodak did not purchase any aluminum from any Defendant or alleged co-conspirator.  Ex. 1, Hausman Decl. ¶ 7 & tbl. 7 (summarizing Kodak purchase data produced at KODAK_001384–001390); ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

**Plaintiff's (Kodak) Response**:  No dispute.

45.   Kodak's aluminum purchases include purchases that were made pursuant to fixed-price contracts, without a floating Midwest Premium or Midwest Transaction Price component.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

**Plaintiff's (Kodak) Response**:  It is not disputed that some contracts refer to a "fixed" or "fixed forward" price, but Kodak always paid the applicable regional premium.  ████████████

████████████████████████████████████████████████████



████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

Finally, numerous Kodak aluminum supply agreements ███████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

 **Defendants' Reply:**  Kodak has not disputed that its aluminum purchases include purchases under fixed-price contracts without a floating Midwest Premium or Midwest Transaction Price component.

 The evidence discussed by Kodak also confirms that there is no genuine dispute of fact on this issue because Kodak was able to fix the price or premium it paid for metal over time, thus avoiding exposure to changes in the Midwest Premium.  For example, as Kodak admits,

---

[14] **[Kodak Resp.]** Some or all purchases from European suppliers for US delivery incorporate the European premium rather than the Midwest US Transaction Price and/or the MWP. There is no basis to exclude those purchases from this action and Defendants have not moved for such relief. Accordingly, the distinction between the Midwest Transaction Price and/or Midwest Premium and the European premium is immaterial for purposes of this motion.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

Instead of contesting whether it purchased aluminum pursuant to fixed-price contracts, Kodak asserts the separate proposition that despite the existence of contracts without a floating Midwest Premium or Midwest Transaction Price component, it ████████████████████ ███████ That ambiguous statement appears to be a subjective characterization of the purchase prices paid by Kodak rather than an objective statement of fact about those purchase prices. It is also irrelevant. Neither Kodak's characterization of its purchase prices nor the evidence cited in support of that characterization establishes that an increase in the Midwest Premium would directly, automatically, or unavoidably result in an increase in the all-in purchase prices paid by Kodak. Furthermore, it is beyond genuine dispute that if Kodak's purchase price was fixed over time, any increases in the Midwest Premium over that period would not have affected Kodak.

46.    Kodak's purchases include spot purchases made without a written contract containing a floating Midwest Premium or Midwest Transaction Price component. ████████

██████████████████████████████████████████████

███████████████

**Plaintiff's (Kodak) Response**:  It is not disputed that Kodak made spot purchases of aluminum, but it is disputed that those purchases lacked a floating premium component. ███

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

**Defendants' Reply:**  Kodak has not disputed that its purchases include spot purchases. Kodak asserts that all such purchases would have included a floating premium component, but the evidence it submits ████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

47.    Kodak was able to, and did, enter into transactions that had the effect of hedging future changes in the Midwest Premium. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

**Plaintiff's (Kodak) Response**:  This is disputed.  ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

As discussed in Kodak's response to Paragraph 45 above, ███████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████  *See also supra* at Response to ¶ 45.

**Defendants' Reply:**  Kodak has not disputed that it entered into fixed-forward agreements that had the effect of hedging the price of aluminum, but contends that it was only able to "fix the LME price portion."  It cites evidence that ███████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████ Kodak fails to cite any evidence

that could give rise to a material dispute of fact on this issue.

48.     Kodak was able to, and did, negotiate with aluminum producers and suppliers as to

price. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

**Plaintiff's (Kodak) Response**:  It is not disputed that Kodak negotiated with aluminum

suppliers, but ██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████

      █████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

**Defendants' Reply:**  Kodak has not disputed that it was able to, and did, negotiate with aluminum producers and suppliers as to price.  Although Kodak asserts that ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ that assertion is irrelevant because it does not

dispute or deny that all-in prices are negotiable or that increases in one price component could be

offset by reductions in another.  Kodak does not cite any evidence giving rise to a dispute of fact

on this issue.  To the contrary, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

### D.   Mag Instrument Inc.

49.   From January 1, 2010, through June 30, 2015, Mag Instrument, Inc. ("Mag") claims

to have purchased approximately ████ metric tons of aluminum.[15]  *See* Ex. 35, Mag's Resps. &

Objs. to Contention Interrogs. at 9–10 (June 10, 2016) (identifying Mag purchases for which

damages are sought); Ex. 1, Hausman Decl. ¶ 7 & tbl. 8 (summarizing Mag purchase data

produced at MAG_005148).

---

[15]  Mag produced usable transaction data only as to its purchases from Hydro.  Ex. 1, Hausman Decl. ¶ 8
& tbl. 8 ("Mag's purchases from other suppliers are not readily discernible from their data."). ████████
████████████████████████ The estimate of ████ metric tons relates to Mag's purchases only from
Hydro.

**Plaintiff's (Mag) Response**:  Defendants' purport to shrink the universe of purchases for which Mag seeks damages because they do not find some of the data "usable" or information about its purchases "readily discernible."  To be clear, the universe of purchases for which Mag seeks damages are those identified in Mag's responses to Defendants' contention interrogatories, attached as Exhibit 35 to Defendants' Motion for Summary Judgment.  Any dispute about the amount of aluminum purchased is irrelevant to the legal issues raised by Defendants' motion.

**Defendants' Reply:**  FLPs cite no evidence giving rise to a material dispute of fact.

50.    From January 1, 2010, through June 30, 2015, Mag did not purchase any aluminum from any defendant or alleged co-conspirator.  Ex. 1, Hausman Decl. ¶ 7 & tbl. 8; ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

**Plaintiff's (Mag) Response**:  No dispute.

51.    Mag's aluminum purchases include purchases that were made pursuant to fixed-price contracts, without a floating Midwest Premium or Midwest Transaction Price component.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

**Plaintiff's (Mag) Response**:  James Zecchini, Mag's corporate vice president, testified

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█ A forward contract, in which Mag would agree to a fixed all-in price for future prices of aluminum with its suppliers, when those suppliers were interested in negotiating such a contract, is not the same as a hedge against the Midwest Premium.

**Defendants' Reply:**  Mag has not disputed that its aluminum purchases include purchases under fixed-price contracts that make no reference to the Midwest Premium or Midwest Transaction Price.  Instead, Mag acknowledges that it would often "agree to a fixed all-in price for future prices of aluminum with its suppliers," which by definition means that Mag would be unaffected by subsequent changes in the Midwest Premium. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████   Neither Mag's characterization of its purchase prices nor the evidence cited in support of that characterization establishes that an increase in the Midwest Premium would directly, automatically, or unavoidably result in an increase in the all-in purchase prices paid by Mag.

52.    Mag was able to, and did, enter into transactions that had the effect of hedging future changes in the Midwest Premium. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

**Plaintiff's (Mag) Response**:  This is disputed.  A forward contract, in which Mag would agree to a fixed all-in price for future prices of aluminum with its suppliers when those suppliers were interested in negotiating such a contract, is not the same as a hedge against the Midwest Premium.  Hedging in this context requires the employment of a market neutral strategy that seeks to avoid a *specific* form of market risk.  ██████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████

**Defendants' Reply:**  Mag has not disputed that its aluminum purchases include forward buys that had the effect of hedging future changes in the Midwest Premium.  Instead, Mag acknowledges that it would often "agree to a fixed all-in price for future prices of aluminum with its suppliers," and by definition, these fixed-price contracts guaranteed that Mag would be unaffected by subsequent increases in the Midwest Premium.  ████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████

53.    Mag was able to, and did, negotiate with aluminum producers and suppliers as to price.  ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

**Plaintiff's (Mag) Response**:  No dispute as to the fact that Mag negotiated part of the price it paid for aluminum during the Relevant Time Period.  ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

**Defendants' Reply:**  Mag has not disputed that it was able to, and did, negotiate with aluminum producers and suppliers as to price.  Although Mag assert that these negotiations ███

████████████████████████████ that assertion is irrelevant because it does not dispute or deny that all-in prices are negotiable or that increases in one price component could be offset by reductions in another.  ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

III.    **Additional Facts.**

54.    The Midwest Transaction Price as reported by Platts is intended to reflect the

"[d]aily all-inclusive or 'all-in' price for spot physical 99.7% high-grade P1020A aluminum."

Platts Specifications Guide (August 2020) at 9.[16]  Platts describes that price as follows:

> The assessment takes into account all P1020 trading data obtained
> through the Platts daily survey of P1020 activity, giving priority to
> any spot physical all-in transactions, bids, or offers.  In the absence
> of all-in market information, Platts collects a wide range of other
> relevant market data, including, but not limited to, prevailing
> exchange-traded values plus applicable premiums for delivery to a
> typical-freight Midwest aluminum user.

*Id.* at 9; *see also* Class Cert. Order, ECF No. 1274, at 8 ("To calculate the MWP, Platts first surveys

the all-in prices paid in physical transactions in the spot market for aluminum for delivery in the

midwestern United States on a given day."); Zona Report, ECF No. 920-4, ¶ 10 ("The MW-TRP

[*i.e.*, Midwest Transaction Price], which is developed and reported by Platts, is a measure of actual

spot transaction prices for aluminum delivered to plants in the Midwest."); ████████████████

████████████████████████████████████████████████  Ex. 54,

PLATTS_ALUM00000001 ("Platts editors survey nearly all of the primary and secondary

aluminum producers selling into the US sport market.").

**Plaintiffs' Response**: A contract based on MWTP is by definition the LME price plus the

MWP. Ex. 75 (Vazquez Decl.), §2.  *See also generally* Attachment B to the Vazquez Decl. (Senate

submission and testimony).  Platts defines the MWTP as the regional differential or "premium" to

the LME price which represents the additional value of having aluminum supplied directly to

where it is needed when it is needed to locations across the market.  *Id.*; Ex. 95 (https://www.

---

[16]  *Available      at      https://www.spglobal.com/platts/plattscontent/_assets/_files/en_our-methodology/ methodology-specifications/nonferrous.pdf.*

spglobal.com/platts/en/our-methodology/priceassessments/metals/us-aluminum-transaction).  Ex. 80 (SR) at 171-72 (the all-in  price for aluminum is the LME price plus the MWP, "[l]arge aluminum users typically closely monitor the LME and Midwest Premium prices, since both prices will largely determine the all-in price they will pay for aluminum in contracts with aluminum producers"); Ex. 96 (Pellegroms Dep. Tr.) at 34:3-14; Ex. 92 (Hardcastle Dep. Tr.) at 83:4-13 ████

████████████████████████████████████████████████████████████

████████████████████████████████████████  Because Platts editors survey nearly all of the primary and secondary aluminum producers selling into the U.S. spot market, the number accurately measures the LME price plus the MWP.  Ex. 97, PLATTS_ALUM00000001 at 04.

**Defendants' Reply:**  Plaintiffs do not appear to dispute that Platts calculates the Midwest Transaction Price by surveying the all-in price of spot transactions for delivery to the Midwest, and they cite no evidence that gives rise to a dispute of material fact.  Plaintiffs mischaracterize Exhibit 95, which defines the MWTP as the "spot physical value of 99.7% P1020 high-grade aluminum."  The cited witness testimony characterizing the MWTP does not alter the facts of how Platts calculates the MWTP and does not generate a dispute of fact.

55.     The Midwest Premium as reported by Platts approximates the difference between the Midwest Transaction Price and the LME daily cash settlement price for aluminum.  *See* Ex. 1, Hausman Decl. ¶ 10; Zona Report, ECF No. 920-4, ¶ 74 ("The [MWP] . . . measures the difference in value between the LME price and the local transaction reference price (e.g., [MWTP] in Detroit).").

**Plaintiffs' Response**: *See* PSUMF, ¶54, *supra*.

**Defendants' Reply:**   Plaintiffs do not appear to dispute that the Midwest Premium is measured as the difference between the MWTP and the LME daily cash settlement price, and they cite no evidence that gives rise to a dispute of material fact.

56.   During the relevant period, the Midwest Premium ranged between approximately 5 percent and 23 percent of the Midwest Transaction Price.  Ex. 1, Hausman Decl. ¶ 11.

**Plaintiffs' Response**: Plaintiffs agree that during the relevant period, the MWP ranged between approximately 5% and 23% of the MWP.  The citation to Hausman Decl., ¶11 appears to be in error and the proper citation is to Hausman Decl., ¶10.

57.   A number of informed commentators disagree with Plaintiffs' contention that LME warehouse queues raise all-in purchase prices for aluminum.  For example:

**Plaintiffs' Interim Response To This Portion of Paragraph 57**: This "undisputed fact" by Defendants is puzzling, because on its face, it acknowledges disagreement, which must be resolved in favor of Plaintiffs for purposes of this motion.  And it is all inadmissible hearsay. Contrary to Defendants' contention, it is a fact that, aside for purposes of litigation or interested-party statements concerning the investigations into Defendants' practices, no one in the industry ever said that LME prices and local premia move inversely.  Each example Defendants cite is false or misleading:

**Defendants' Interim Reply On This Portion of Paragraph 57:**  The undisputed fact that Plaintiffs' theory of causation and injury is the subject of dispute and disagreement underscores the complex, indirect, and elongated chain of causation underlying Plaintiffs' claims. Furthermore, Plaintiffs' assertion that "no one in the industry ever said that LME prices and local premium move inversely" is an irrelevant non sequitur.  As this Court observed at page 108 of its order denying class certification (ECF No. 1274), the relevant question is not whether LME prices

and local premia always move inversely, but whether *queues* cause them to do so.  It is undisputed that many informed commentators have concluded that they do.

**Defendants' Paragraph 57 Examples And Plaintiffs' Response To These Examples**:

a.  The CRU group stated on November 27, 2013, that "the impact of premium inflation is not to increase the free market price but rather to cause the LME price to trade at a discount to the exogenously-set free market price."  Ex. 55, CRU, *Warehouse rule changes cut metal queues but the effect on premia is less clear* (Nov. 27, 2013).  The FLPs' class certification expert, Dr. Christopher Gilbert, described CRU as "a well-respected and reliable source of industry information." Gilbert Reply, 13-md-02481 ECF No. 1041-1, ¶ 48 & n.44.

**Plaintiffs' Response**: Dr. Gilbert did say that he agrees that CRU is a well-respected and reliable source of industry information, but he disagreed with this proposition.  Gilbert Sur-Reply Rpt., 13-md-02481 ECF No. 1195-1, ¶10. Aluminum prices, like all prices determined in free markets, are determined by supply and demand. *Id.*

**Defendants' Reply:**  Plaintiffs do not dispute that the CRU group is a well-respected and reliable source or that it concluded that the impact of premium inflation arising from queues "is not to increase the free market price, but rather to cause the LME price to trade at a discount" to the free market price of non-LME aluminum.

b.  A book edited by Dr. Gilbert stated that "[t]he increase in premiums [attributable to longer queues] may not increase the overall price . . . if it simply reduces the portion of the price represented by the LME quotation." Ex. 56, Robin G. Adams, Christopher L. Gilbert, and Christopher G. Stobart, Modern Management in the Global Mining Industry, at 112.

**Plaintiffs' Response**: The key word here is "if," which renders this statement meaningless. It stands for the simple mathematical proposition that if Defendants were right and the all-in price was fixed and the MWP went up, the LME price would have to go down in order to compensate.  Further, Dr. Gilbert did not edit this book. Robin Adams was the sole author, but died before the book could be completed.  Dr. Gilbert and Christopher Stobart brought the book to publication. The views expressed are solely those of Robin Adams, not of Dr. Gilbert nor Christopher Stobart.

**Defendants' Reply:**  Plaintiffs have not cited a material dispute.

c.  The LME stated in November 2013 that "the effect of queues is to create a discount between the free market price of metal, and the value of an LME warrant in a warehouse with queues.  By extension, this causes the LME price to trade at a discount to the free metal price.  This is then observed by the market as the free

market price of metal trading at a premium to the reported LME price." Ex. 57, LME, *Summary Public Report of the LME Warehousing Consultation* (Nov. 2013).

**Plaintiffs' Response**: This is a self-serving statement made by the LME after this litigation started, when the LME was still a party to this litigation. The Defendants had a significant ownership stake in the LME and were members of several committees at the time the report was filed, including the Executive Committee that prepared the report. *See* Ex. 98, GLEN-ALI-0851729 at 62



Further, just months before this report was issued, Nigel Dentoom, a member of the LME User Committee, stated that the queues in Detroit and Vlissingen were *not* a threat to LME prices, Ex. 100, JPMS-ALI-0424773 at 73:

**Defendants' Reply:** Plaintiffs have not cited a material dispute. The Nigel Dentoom statement cited by Plaintiffs does not address the relevant question; it addresses the separate question of whether the LME price is losing its relevance as a hedging tool.

d. Europe Economics stated on February 20, 2007, that "removal of the FOT charge [*i.e.*, the charge for loading metal out of an LME warehouse] would add to the value of the warrant. It would do so because the warrant holder would no longer be liable to pay this charge, and so the value of the warrant would be increased for each potential warrant purchaser by his estimate of the net present value of that future liability." Ex. 58, Europe Economics, *A Review of the possible consequences of a change in contract terms from "in warehouse" to "FOT basis", with respect to all metals traded on the London Metal Exchange* (Feb. 20, 2007). It also later stated in a report on the effects of minimum load-out rates that "long queues may have a significant impact on the value of warranted metal. This is of particular concern because any warrants whose value is significantly lowered will be used to settle Exchange contracts, and thereby set the LME price." Ex. 59, Europe Economics, *Assessment of Warehouse Minimum Loading Out Rates (Executive Summary)*.

**Plaintiffs' Response**: This Europe Economics consulting report supports Plaintiffs. The study did *not* concern artificially lengthening the delays involved in taking delivery from LME warehouses. Instead, it concerned changes to the "free on truck (FOT)" charge – a charge levied by warehouses to load-out aluminum. Ex. 101 at

ii.  The report also drew no connection between increased queues and lower LME prices.  In fact, the authors expressed "scepticism" about any "reduction in premia to offset the increase in the price of warrants," and added that any correlation was "uncertain." *Id.* at v.  "The overall . . . change would *not* be to reduce metal prices." *Id.* at vii.  Further, in a 2011 study addressing the impact of queues on the LME price, European Economics found that excessive queues were regarded as damaging ████████

████████████████████ Ex. 102, GS-METRO-00000817 at 18 ████████████████████

**Defendants' Reply:**  Plaintiffs have not disputed that Europe Economics concluded that changes that raise or lower the cost of taking delivery of metal from an LME warrant (as queues do) impact the price of an LME warrant, *i.e.*, the LME cash price.  Furthermore, Plaintiffs' Exhibit 101 states straightforwardly that "[o]ur assessment is that premia might well reduce in the long term and on average tend to offset the increase in the value of warrants." Ex. 101 at v. ████████

████████████████████████████████████

e.  Goldman Sachs stated on October 31, 2013, that "the queues have no impact on the physical market, including physical prices and aggregate fundamentals." Ex. 60, Goldman Sachs, *The economic role of a warehouse exchange* (Oct. 31, 2013).

**Plaintiffs' Response**: This is a self-serving opinion piece drafted by an employee of Goldman Sachs (who is a Defendant here), based on an argument that was created for purposes of defending itself against the conduct alleged in this case.  It is completely unsupported by any factual or empirical evidence that would tend to show that longer queues result in lower LME prices.

**Defendants' Reply:**  Plaintiffs have not cited a material dispute.

f.  The Financial Times stated on June 22, 2011 that "the length of the queue at Detroit has the effect of pushing down the price of warrants in Detroit.  And since it is the lowest value warrants that set the price on the LME (because these are the warrants that traders will deliver against short positions), the length of the queue also has the effect of, all other things being equal, pushing down the LME cash price." Ex. 61, Financial Times, *Detroit delays complicate aluminum pricing* (June 22, 2011).

**Plaintiffs' Response**: This selective quote from an opinion piece is taken out of context, and with context, supports Plaintiffs.  First, the article says that any purported connection is purely "hypothetical," and that "most traders" disagree with the assertion that the queues do not increase the all-in price of aluminum. Ex. 61 at 1-2.  It goes on to say that "[t]here is no such clear correlation [between cancelled warrants and] the LME aluminum prices." *Id.* at 2.  The author also admits that LME prices are set by "lots of other variables," *id.*, which are laid out

in Ex. 75 (Vazquez Decl.), §2 (stating that "smelting costs (price of energy, alumina, carbon and labor costs," "the balance between physical demand and supply . . . and the resulting inventory level," and "changes in macroeconomic variables such as currencies, interest rates and GDP" drive the LME price). *Id.*

**Defendants' Reply:**  Plaintiffs have not disputed that the Financial Times stated that "the length of the queue at Detroit has the effect of pushing down the price of warrants in Detroit."  Although Plaintiffs suggest that this statement was subject to a number of contextual limitations, their response mischaracterizes the document, which speaks for itself.

g.  Metal Bulletin stated on March 3, 2015, that queues have "caused the LME price to trade at a discount to the so-called 'all-in' price of aluminium, which is calculated by adding the premium in any given location to the LME price."  Ex. 62, Metal Bulletin, *LME warehousing policy: the proposals, the discussion and what it all means* (March 3, 2015).

**Plaintiffs' Response**: This out-of-place, conclusory, and unattributed statement contains no evidence, factual or empirical, that tends to support that longer queues result in lower LME prices.

**Defendants' Reply:**  Plaintiffs have not cited a material dispute.

h.  Alcoa stated on October 18, 2013, that "[c]ontrary to some market commentators' views, it is not the case that long queues have resulted in higher overall metal prices.  In fact, the total price for delivered aluminium continues to be well below the prefinancial crisis levels."  Ex. 63, Alcoa, *Analysis of the Proposed Amendment to the LME Warehouse Rules* (Oct. 18, 2013).

**Plaintiffs' Response**: This document strongly supports Plaintiffs, and does not support Defendants at all.  What Alcoa said – on the face of the statement – is that the LME price can be going down at a rate faster than the premiums are going up, so increasing queues does not necessarily mean that the ***overall*** price is going up, despite long queues increasing the premiums.  In this document, Alcoa found that "[t]he regional premium reflects costs associated with a number of factors which are not relevant to the LME price" and repeatedly acknowledges the effect of queues on regional premia and that the premium is a part of the all-in price.  Ex. 63, ¶3.3.  This is consistent with the statements that Alcoa made to the Senate Subcommittee that "the LME and premium prices are not inversely related, but move independently of one another."  *See* Ex. 80 (SR) at 180 & n.1065.

**Defendants' Reply:**  Plaintiffs' unavailing attempt to re-characterize the document does not present a material dispute.

i.  Rusal stated on March 31, 2014, that it "agrees with the LME's analysis that any rise in aluminium premiums would lead to a corresponding fall in the exchange price."  Ex. 64, Metal Bulletin, *LME needs to make sure market stays transparent – Rusal* (Mar. 31, 2014).

**Plaintiffs' Response**: The article stands for the proposition that the LME price trades at a discount to the all-in price, which contains two components: the LME price and the regional premium.  The regional premium is added to the LME price to determine the all-in price.

**Defendants' Reply:**  Plaintiffs have not cited a material dispute.

**Plaintiffs' (FLPs) Response ¶57 (cont'd)**: The LME price does not inherently move inversely to the MWP, as both price references are fundamentally different, independent in nature, and driven by separate market drivers.  Ex. 75 (Vazquez Decl.), §2.  The official price on the LME is declared daily at the end of the second of the LME's five-minute open outcry trading rings, and is based on the supply and demand for that particular contract.  *Id.*  According to the LME, the trading sessions are: "representative of global supply and demand." *Id.*  Among the most important underlying factors that shape supply of and demand for LME aluminum contracts, and thus price, are (a) smelting production costs (price of energy, alumina, carbon and labor); (b) the balance between physical demand and supply of primary aluminum in the Western World, and the resulting inventory level; and (c) changes in macroeconomic variables such as currencies, interest rates and GDP.  *Id.*  The LME price and the MWP stand for completely different concepts and are directly driven by different market factors.  *Id.*

The MWP is a regional logistic "fee" independently determined from the LME aluminum price.  The underlying market determinants of the MWP are: (a) inland, barge and ocean freight rates; (b) storage fees; (c) loading and unloading charges; (d) port fees; (e) cost of financing; and (f) duties. *Id.* The MWP is charged on top of the LME aluminum price.  The MWP is ultimately determined by the full cost of logistics of transporting aluminum to the United States Midwest.  *Id.*

Because the LME price and the MWP stand for different concepts and are directly driven by different market factors, they do not offset each other.  *See generally* Ex. 75 (Vazquez Decl.), §2; *see also id.* at 7 ("the MWP moves independently from changes in supply and demand for

primary aluminum units in the U.S., and independently of the LME price"); *id.* at 2 ("In real life, the LME price does not inherently move inversely to the MW Premium, as both price references are fundamentally different, independent in nature, and driven by separate market drivers."); *id.* at 7 ("the LME price and MWP stand for completely different concepts and are directly driven by different market factors"); *id.* at 2 ("the LME aluminum price is determined on the London Metal Exchange by supply and demand for all LME aluminum contracts," and "[t]he MWP is ultimately determined by the full cost of logistics of transporting primary aluminum to the US Midwest"); Ex. 76 (Zona Supp. Decl.) (correcting Defendants' mischaracterizations of prior Dr. Zona's prior testimony and confirming that queues increase premiums).  The LME price is based on global supply and demand forces. Ex. 88 (Ramsey Dep. Tr.) at 23:19-24 ████████████████████

████████████████████████████████████████

████████████████████████

**Defendants' Reply (cont'd):**  Plaintiffs' lengthy response once again attacks a "perfect off-set" straw-man argument that Defendants have never made, *i.e.*, that LME prices and Midwest Premiums *always* move inversely.  The question relevant to Plaintiffs' theory of causation and injury is the separate question of whether *queues* cause LME prices to move inversely to Midwest Premiums by raising the cost of removing warranted aluminum from LME warehouses and thus depressing the value of LME warrants relative to the non-LME spot-market aluminum used to determine the Midwest Transaction Price.  For purposes of this motion, Defendants seek to establish only that there is disagreement on the latter question and that there are informed and reputable industry commentators that support Defendants' view.  There is no genuine dispute about that proposition.

58.     A significant portion of smelter contracts with U.S. customers did not contain either a floating Midwest Premium or a floating Midwest Transaction Price as a reference price during the relevant period.  *See, e.g.*, Class Cert. Order, ECF No. 1274, at 9–10 ("However, many purchase contracts do not reference the MWTP or MWP at all, and those that do reference the MWTP or MWP do so in a variety of ways."); First Joint Letter, ECF No. 1254 at 1, 5–6 (FLP estimate that approximately 69% of Alcoa contracts during the relevant period incorporate the MWTP, close to zero percent incorporate the MWP, and the balance incorporate neither of those terms as reference prices); *id.* at  10 (FLP estimate that the percentage of Rio Tinto contracts that contain the MWP or MWTP was generally similar to that of Alcoa contracts); *id.* at 17, 21 (substantial number of Rusal contracts do not contain either the MWP or MWTP); *id.* at Exs. 12–15, 24–32, 38–47 (exemplars of contracts that do not incorporate the MWP or MWTP); *supra* ¶¶ 12, 18, 19, 23, 29, 37, 41, 45, 51.

**Plaintiffs' Response**:  Regardless of the style of contract entered into, on all its first-level purchases of aluminum, both the MWP and the LME price for aluminum were paid.  Even if the contract does not contain an explicit MWP term, the MWP is included in the purchase price, every time.  *See supra* ¶¶17-17, 20-22, 26-29, 32-33, 40-42, 44-45, 54-56, 61.  A certain percentage of the Alcoa data, that carried an identifier of "NAPM," (which FLPs did not seek to certify for class purposes and do not seek damages on now) appeared in the data as not having paid the full MWP, however, Plaintiffs do not seek damages on those types of contracts, and it appears that is a function of internal accounting at Alcoa, not reflective of transactions where the MWP was not paid.  Neither the current Plaintiffs, nor members of the class of Plaintiffs who previously sought certification, seek redress for any purchases where the MWP was not paid.  Class Cert. Reply Br.,

13-md-02481 ECF No. 1238 at 6.  IPs have no specific knowledge concerning contracts other than their own.

**Defendants' Reply:**  Plaintiffs have not disputed that "[a] significant portion of smelter contracts with U.S. customers did not contain either a floating Midwest Premium or a floating Midwest Transaction Price as a reference price during the relevant period."  To the contrary, the IPs deny specific knowledge of any contracts other than their own; neither the IPs nor the FLPs deny that approximately 31% of Alcoa and a similar portion of Rio Tinto Alcan contracts do not incorporate either the MWP or MWTP; and both IPs and FLPs explicitly admit that Alcoa's NAPM contracts do not require payment of "the full MWP."

59.     Most of FLPs' and IPs' contracts did not incorporate a floating Midwest Premium term during the relevant period.  *See, e.g.*, *supra* ¶¶ 12, 18, 19, 23, 29, 37, 41, 45, 51 (identifying purchases and contracts that did not incorporate the Midwest Premium); ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

**Plaintiffs' Response**: Plaintiffs have not reviewed each and every contract for the purchase of aluminum, so are not able to say whether "[m]ost" contracts "did not incorporate a floating Midwest Premium term during the relevant period."  To the extent this statement means that

contracts do not have MWP or MWTP on the face of the contract for sale, it is irrelevant because on all first-level purchases of aluminum, the MWP is paid.  *See, e.g.*, *supra*, RSUMF, ¶¶12, 18, 19, 23, 29, 37, 41, 45, 51.  IPs further dispute this assertion on the bases set forth in their Responses to ¶¶37-53, *supra*.  IPs have no specific knowledge concerning contracts other than their own.

**Defendants' Reply:**  Plaintiffs have not disputed that most of their purchase contracts did not incorporate a floating Midwest Premium term during the relevant period.

60.     The smelter contracts with U.S. customers during the relevant period that did contain either a floating Midwest Premium or a floating Midwest Transaction Price as a reference price typically included at least one additional price component, such as a "shaping premium," "product premium," or "alloy premium." ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████

**Plaintiffs' Response**: Plaintiffs agree that smelter contracts with U.S. customers sometimes have additional price components, such as a "shaping premium," "product premium" or "alloy premium."  IPs have no specific knowledge concerning contracts other than their own.

61.     During the relevant period, sales by smelters Alcoa, Rio-Tinto Alcan, and Rusal to U.S. customers totaled more than ten million metric tons of primary aluminum.  Ex. 1, Hausman Decl. ¶ 12.

**Plaintiffs' Response**: This is true, but incomplete as there are more first-level sales of aluminum during the damages period in the United States from other smelters such as Century and Noranda.

## PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS

**IV.     Defendants Intended to and Did Directly Impact the Price of Physical Aluminum**

62.     In 2010, Goldman Sachs acquired Metro, JPMorgan acquired Henry Bath, and Glencore acquired Pacorini.   Ex. 103, Javier Blas, *Goldman and JPMorgan enter metal warehousing*, Financial Times (Mar. 2, 2010).

**Defendants' Response:**  Defendants agree that Goldman Sachs, JPMorgan, and Glencore each acquired operators of LME warehouses in 2010 through separate arms-length transactions. Goldman Sachs acquired Metro in February 2010; JPMorgan acquired Henry Bath in July 2010 as part of a larger purchase of most of RBS Sempra's commodities business; and Glencore acquired Pacorini in September 2010.   Those facts, however, are irrelevant to whether Plaintiffs have efficient enforcer standing to assert "umbrella" antitrust claims based on purchases of aluminum from third-parties that are not alleged to be conspirators.   Defendants' purchases also are not suggestive of a conspiracy among Defendants.   JPMorgan did not acquire a stand-alone LME warehouse company but instead acquired a large commodities business and acquired an LME warehouse business as a relatively small component of that acquisition.   Goldman Sachs and Glencore acquired LME warehouse companies roughly seven months apart.   And other aluminum traders not alleged to be conspirators also acquired operators of LME warehouses in 2010, *e.g.*,

Trafigura acquired NEMS in March 2010, and Noble acquired Delivery Network in October 2010. Kaplan Class Rep., ECF No. 1014-2, ¶ 120; Class Cert. Order, ECF No. 1274, at 67.

63.    Blythe Masters, the head of JPMorgan's commodities business explained the reason that JPMorgan acquired the Henry Bath warehousing system: "Just being able to trade financial commodities is a serious limitation because financial commodities represent only a tiny fraction of the reality of the real commodity exposure picture . . . . We need to be active in the underlying physical commodity markets in order to understand and make prices." Ex. 104, JPMS-ALI-0652936 at 40; Ex. 105, Gregory Meyer and Jack Farchy, *Wall St falls out of love with commodities trading*, Financial Times (Aug. 4, 2013).

**Defendants' Response:**  Defendants do not dispute the accuracy of the quotation attributed to Blythe Masters.  That quotation, however, was directed at commodities markets in general—not the aluminum market—and is irrelevant both to Plaintiffs' efficient enforcer antitrust standing and to Plaintiffs' assertions of conspiracy.  In August 2014, Judge Forrest characterized the quotation at issue as follows:  "The statement by Blythe Masters cited by plaintiffs in their briefs (Agfa Compl. ¶ 56; Comm. Compl. ¶ 66; Cons. Compl. ¶ 72; FLP Compl. ¶ 379; Mag Compl. ¶ 55) suggests only that JP Morgan's ownership of Henry Bath gave it access to more information and data on the physical aluminum market.  Standing alone, it does not provide evidence of anticompetitive conduct in the warehouse storage market, nor does it provide any evidence of communications between Henry Bath and JP Morgan for the purpose of effectuating a conspiratorial agreement."  *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *31 n.36 (S.D.N.Y. 2014).

64.    After acquiring the warehousing companies, Glencore, Goldman, and JPMorgan also began purchasing massive amounts of aluminum.  Goldman's aluminum holdings increased

from less than $100 million in 2009 to more than $3 billion by 2012, representing 25% of North America's annual consumption.  Ex. 80 (SR) at 169.

**Defendants' Response:**  Defendants do not dispute that they acquired substantial amounts of aluminum after 2009, but note that Plaintiffs' figures are skewed and irrelevant.  The $3 billion figure referenced by Plaintiffs (i) is a worldwide figure, not a U.S. figure, (ii) includes substantial volumes of LME warrants that Goldman held temporarily as a result of LME trading activity and then delivered back to the LME to settle LME short positions, without receiving a regional premium, and (iii) is only a small fraction of the more than 125 million metric tons of worldwide aluminum consumption (excluding China) that occurred during the relevant period according to the Vazquez report submitted by Plaintiffs.  *See* Ex. 75, Vazquez Decl. at 12 & tbl. J.  This temporary $3 billion figure for combined LME and non-LME worldwide aluminum holdings is irrelevant to whether Plaintiffs have efficient enforcer standing to assert umbrella antitrust claims based on purchases of aluminum from third-parties not alleged to be conspirators.  Defendants also object to Plaintiffs' reliance on the Senate report, which consists of inadmissible hearsay.

65.     In July 2010, Glencore acquired approximately one million tonnes of physical aluminum from Rusal.  Ex. 106, PUSA-E00167433 at 35.

**Defendants' Response:**  Defendants do not dispute that Glencore made a substantial purchase of aluminum from Rusal in July 2010.  That purchase has no relevance to whether Plaintiffs have efficient enforcer standing to assert umbrella antitrust claims based on Plaintiffs' purchases of aluminum from third-parties not alleged to be conspirators.

66.     From 2010-2015, JPMorgan owned significant quantities of aluminum warehoused both on- and off-warrant, for sale to customers.  Ex. 107 (Clift Dep. Tr.) at 208:8-18 ("Q.· Fair enough.· I'll rephrase the question. Does the chart indicate that in May of 2012 JPMorgan had 2.1

billion dollars of aluminum stored in warehouses, Pacorini and Metro, which are respectively owned by Glencore and Goldman Sachs, and only 1 billion dollars of metal stored in Henry Bath's· warehouses? A.  I think that's what that is saying, yes."). *See also* Ex. 108 (Sobol Dep. Tr.) at 345:24-346:7 ("Q. Did JPMorgan nonetheless sell aluminum to consumers during the period that we've been discussing today, even if not pursuant to that particular plan? A. Yes. Yes. Q. And did it do so frequently? A. Yes."); Ex. 109, GS-METRO-00049217 ██████████████████

██████████████████████████

   **Defendants' Response:**  Defendants do not dispute that JPMorgan owned significant quantities of aluminum for potential sale to customers, but note that warranted aluminum stored in LME warehouses may be held only temporarily as a result of LME trading activities and then delivered to the LME to satisfy LME short positions, in which case no regional premium is received by the party delivering the warrant.

   67.   On January 10, 2012, JPMorgan's aluminum inventory peaked at over 3.5 million metric tons, with an estimated value of approximately $7,480,000,000.  Ex. 80 (SR) at 380-81 & n.2472.

   **Defendants' Response:**  JPMorgan does not dispute that it owned a substantial quantity of aluminum as of January 10, 2012, but notes that the specific figures cited by Plaintiffs are skewed and irrelevant.  Those figures (i) are worldwide figures, not U.S. figures, (ii) include substantial volumes of LME warrants that JPMorgan held temporarily as a result of LME trading activity and then delivered back to the LME to settle LME short positions, without receiving a regional premium, and (iii) are only a small fraction of the more than 125 million metric tons of worldwide aluminum consumption (excluding China) that occurred during the relevant period according to Plaintiffs' expert report.  *See* Ex. 75, Vazquez Decl. at 12 & tbl. J.  These temporary

figures for combined LME and non-LME worldwide holdings are irrelevant to whether Plaintiffs have efficient enforcer standing to assert umbrella antitrust claims.   Defendants also object to Plaintiffs' reliance on the Senate report, which consists of inadmissible hearsay.

68.   Harbor Aluminum Intelligence estimates that combined primary aluminum inventories held by Defendants in 2012 and 2013 was around 8 million metric tonnes, with about 4 million metric tonnes of primary aluminum off-warrant and 4 million metric tonnes on-warrant. Ex. 75 (Vazquez Decl.), §4.   That equates to about 60% of total aluminum inventories in the Western World, and about 50% of what was held off-warrant.   *Id.*   That amounted to roughly 1.8 times annual U.S. aluminum consumption.   *Id.*

**Defendants' Response:**   Defendants do not dispute that they owned a substantial quantity of aluminum in 2012 and 2013, but note that the estimates cited by Plaintiffs are skewed, irrelevant, and completely unsubstantiated.   Based on the exhibit cited by Plaintiffs, "Harbor Aluminum Intelligence" is the name under which a single consultant, Jorge Vazquez, does business.   Mr. Vazquez cites no support whatsoever for his *ipse dixit* statement that he estimates that combined primary aluminum inventories held by Defendants in 2012 and 2013 was around 8 million metric tons, half on-warrant and half off-warrant.   *See* Ex. 75, Vazquez Decl. at 11–12.   Even taking these numbers as given, the stated estimates (i) are estimates of worldwide holdings, not U.S. holdings, (ii) include substantial volumes of LME warrants that Defendants held temporarily as a result of LME trading activity and then delivered back to the LME to settle LME short positions without receiving a regional premium, and (iii) are only a small fraction of the more than 125 million metric tons of worldwide aluminum consumption (excluding China) that occurred during the relevant period according to Mr. Vazquez.   *See id.*   Mr. Vazquez's estimates of the temporary

levels of Defendants' total worldwide holdings are also irrelevant to Plaintiffs' efficient enforcer standing to assert umbrella antitrust claims.

69.     Defendants coordinated massive warrant cancellations with each other as well as Red Kite and DB Energy which created an enormous delivery queue out of Detroit Metro warehouses.  *See, e.g.*, Ex. 110, GS-METRO-00480221; Ex. 111, GS-METRO-00494685; Ex. 112, GS-METRO-00183452; Ex. 113, GS-METRO-00000309 (DB Energy); Ex. 114, GS-METRO-00010240 (Red Kite) (merry-go-round transactions); Ex. 80 (SR) at 194-208; *see also* Third Amended Complaint,13-md-02481 ECF No. 738, ¶¶251-286.  Many of these warrant cancelations resulted in metal being loaded out of Detroit Metro warehouses only to be loaded back in the other Detroit Metro warehouses in a practice that has been referred to as an aluminum "merry-go-round."

**Defendants' Response:**  Defendants dispute that they "coordinated" cancellations of LME warrants with each other or with Red Kite and DB Energy.  Plaintiffs' assertion of "coordinated" warrant cancellations is unsubstantiated by the cited evidence and irrelevant to Plaintiffs' efficient enforcer antitrust standing.  Contrary to Plaintiffs' assertion, each cancellation of Metro Detroit warrants by a Defendant was undertaken unilaterally based on the individual economic self-interest of the Defendant that cancelled the warrants.  According to Plaintiffs' own expert, cancelling warrants was unilaterally profitable and "guaranteed a nearly automatic profit" with "very little risk" given the market conditions at the time.  *See* Ex. 75, Vazquez Decl., Attachment B at 10–11.  Indeed, many other financial firms were cancelling LME warrants at the time, due in part to the fact that non-LME storage costs were "a tenth the cost of LME warehouses."  *Id*.

With respect to Plaintiffs' assertion of so-called "merry-go-round" transactions at Metro Detroit, Defendants do not dispute that Metro engaged in off-warrant transactions with non-parties

DB Energy and Red Kite, but deny that JPMorgan or Goldman Sachs ever entered into any such transaction.  Metro's off-warrant transactions with DB Energy and Red Kite occurred without the knowledge or involvement of any other Defendant and are described in the Declaration of Leo Prichard, Metro's chief operating officer during the relevant period.  *See* Prichard Decl., ECF No. 1199-2, at 3–5.  Those transactions are also irrelevant to this motion.  Finally, Defendants object to Plaintiffs' reliance on the Third Amended Complaint's allegations (which are not competent evidence) and on the Senate report (which consists of inadmissible hearsay).  *See*, *e.g.*, *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (plaintiff "cannot defeat the motion [for summary judgment] by relying on the allegations in his pleading").

70.     The merry-go-round transactions by Defendants and their co-conspirators in Detroit violated the LME's rules.  The rule prior to 2012 required that an LME warehouse load out 1,500 metric tons a day.  The rule applied to an LME Warehouse Company (not a particular shed) in a particular location, *i.e.*, Detroit or New Orleans.  In 2003, when the Rule was changed from 1,000 metric tons to 1,500 metric tons, the LME noted an exception to the Rule prohibiting intra-location transfers if the ***owner*** of the metal directed the move from one LME Warehouse Company to a different LME Warehouse Company in the same location.  *See* Ex. 115, GS-METRO-00006170 at 71.  The LME rules required that the metal move from one Warehouse Company to another – at the direction of the owner.  *Id.*

**Defendants' Response:**  Defendants incorporate their response to Paragraph 69 and further state that Plaintiffs' assertions are disputed (other than the statement that prior to 2012, the LME's minimum load-out rate was 1,500 metric tons/day), unsubstantiated by the cited evidence, and irrelevant to Plaintiffs' efficient enforcer standing to enforce the antitrust laws.

71. ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████ *See* Ex. 116, GS-METRO-00827709 at 09-10.

████████████████████████████████████████████

██████████████ *Id.* █████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ *Id.*

**Defendants' Response:** ███████████████████████

████████████████████████████████████████████

██████████████████ Those discussions have no relevance to Plaintiffs' efficient enforcer

standing to assert umbrella antitrust claims.  Nor is it evidence of anticompetitive conduct for a

firm considering the purchase of a business to seek to understand better the rules that govern that

business.  Moreover, Plaintiffs' own expert declaration acknowledges that Goldman Sachs'

acquisition of Metro made economic sense not only "because of the unprecedented benefits of the

unique business model that Metro possessed, but also because ownership gave GS the ability to

potentially realize a considerable profit on any off-warrant aluminum position that the company

decided to ship to Metro."  Ex. 75, Vazquez Decl., Attachment B at 4.

72. The merry-go-round transactions described in ¶69, above, violated the LME's rule,

as well as Metro's understanding of the rule.  *See* Ex. 117, GS-METRO-00027606 at 10 ████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████  *Id.*

**Defendants' Response:** Plaintiffs' assertion that Metro's off-warrant transactions violated the LME's minimum load-out rules is disputed, unsubstantiated by the cited evidence, and irrelevant to Defendants' summary judgment motion.

73.    The U.S. Senate's Permanent Subcommittee on Investigations identified the cause of the dramatic increases in the MWP to be the Detroit queue increases.  Ex. 80 (SR) at 178 ("Those queues, over time, have been highly correlated with the increases in the Midwest Premium prices.").

**Defendants' Response:**  This assertion is disputed.  The sentence from the Senate Report states only that "queues, over time, have been highly correlated with the increases in the Midwest Premium," not that the Metro Detroit queues caused dramatic increases in the Midwest Premium. Ex. 80, Senate Report at 178.  This dispute, however, has no relevance to Plaintiffs' efficient enforcer standing to assert umbrella antitrust claims.  Defendants further object to Plaintiffs' reliance on the Senate report, which consists of inadmissible hearsay.

74.    The U.S. Senate's Permanent Subcommittee on Investigations "found that a significant contributor to the Detroit queue length was a number of large warrant cancellations by a small group of financial institutions, including Deutsche Bank; Red Kite; a London hedge fund; Glencore, a commodities trading firm based in Switzerland; JPMorgan; and Goldman." Ex. 80 (SR) at 194.

**Defendants' Response:**  Defendants do not dispute that warrant cancellations can contribute to the lengthening of a warehouse load-out queue if load-out rates are held constant.

That fact, however, has no relevance to whether Plaintiffs have efficient enforcer standing to assert umbrella antitrust claims.  Defendants also object to Plaintiffs' reliance on the Senate report, which consists of inadmissible hearsay.

75.     Defendants cancelled warrants for metal held in their own and competitors' warehouses, which increased the queue length.  Ex. 80 (SR) at 208-09; Ex. 75 (Vazquez Decl.), Exhibit I.  Specifically, in January 2012, JPMorgan cancelled warrants for 100,000 metric tonnes of aluminum, increasing the Detroit queue from 115 to 216 days.  Ex. 80 (SR) at 209; Ex. 75 (Vazquez Decl.), Exhibit I; Ex. 118, JPMS-ALI-1082566.  On May 15, 2012, Goldman cancelled warrants for 50,000 metric tonnes of aluminum, and in July 2012, cancelled another 45,000 warrants, increasing the queue from 285 to 370 days.  Ex. 80 (SR) at 210-11; Ex. 75 (Vazquez Decl.) Exhibit I; Ex. 114, GS-METRO-00475581 at 91.  In December 2012, JPMorgan cancelled warrants for approximately 95,000 metric tonnes of aluminum, and Goldman cancelled warrants for  more than 227,000 metric tonnes of aluminum, increasing the queue in Detroit from 350 to nearly 500 days.  Ex. 80 (SR) at 209, 211-212; Ex. 75 (Vazquez Decl.), Exhibit I; Ex. 119 GS-METRO-00475581 at 91; Ex. 120, JPMS-ALI-1079608; Ex. 121, JPMS-ALI-0697822; Ex. 122, JPMS-ALI-0691039.

**Defendants' Response:**  Defendants do not dispute that they, like other owners of warranted aluminum stored in LME warehouses during the relevant period, cancelled warrants for aluminum and that such warrant cancellations can contribute to the lengthening of a warehouse load-out queue if load-out rates are held constant.  As recounted in Plaintiffs' own expert declaration, canceling warrants made unilateral economic sense because, among other things, relocating aluminum from LME to non-LME storage would "amplify the cash-and-carry profit that the existing contango offered" given that the costs of non-LME storage were "a tenth the cost

of LME warehouses." Ex. 75, Vazquez Decl., Attachment B at 11.  Defendants further note that the alleged warrant cancellations have no relevance to Plaintiffs' efficient enforcer standing to assert their claims.  Defendants also object to Plaintiffs' reliance on the Senate report, which consists of inadmissible hearsay.

76.    Aluminum warrant cancellations caused the queue in Detroit to go from 40 days just after Goldman purchased Metro in 2010 to more than 600 days by the end of 2014.  Ex. 80 (SR) at 178, 193; Ex. 75 (Vazquez Decl.), Attachment B at 14 (Chart 7) (Harbor's Estimated Aluminum Load-Out Waiting Time in LME Detroit Warehouses).

**Defendants' Response:**    Defendants do not dispute that warrant cancellations can contribute to the lengthening of a warehouse load-out queue if load-out rates are held constant. That fact, however, has no relevance to whether Plaintiffs have efficient enforcer standing to assert umbrella antitrust claims.  Defendants also object to Plaintiffs' reliance on the Senate report, which consists of inadmissible hearsay.  To the extent that the Court considers the Senate report, the same section that Plaintiffs cite also observes that "[a] critical factor affecting aluminum trading in recent years has been an unprecedented growth in the size of physical aluminum inventories at LME-approved warehouses, as industrial demand for the metal plummeted during the financial crisis and metal owners sought to sell or store their excess stocks."  Ex. 80, Senate Report at 178.

77.    In December 2011, Glencore and JPMorgan engineered a swap of aluminum and cancellation of warrants that instantly caused a large queue at Pacorini's Vlissingen warehouse. Glencore International AG provided JPMorgan Chase Bank, N.A. warrants for 860,000 tonnes of physical aluminum stored in Vlissingen in return for warrants for 860,000 tonnes of physical aluminum stored in Metro's Detroit warehouse.  Ex. 123, JPMS-ALI-0000426; Ex. 124, JPMS-ALI-0385694; *see also* Ex. 80 (SR) at 380 n.2470.

**Defendants' Response:**  Defendants do not dispute that Glencore and JPMorgan entered into a swap transaction relating to aluminum stored in Vlissingen in December 2011.  Plaintiffs' Vlissingen allegations, however, are beyond the scope of Plaintiffs' claims except for Fuji's claims because all Plaintiffs other than Fuji were denied leave to add those allegations to their complaints. *See* Leave to Amend Order, ECF No. 946, at 11, 14, 18–19; Class Cert. Order, ECF No. 1274, at 27–29, 91–95.  Even as to Fuji, the Vlissingen swap has no relevance to whether Plaintiffs possess efficient enforcer standing to assert their claims.

The swap transaction was also a rational, lawful, and procompetitive transaction that delivered value to both parties to the transaction.  At the time, Glencore needed approximately 860,000 metric tons of warrants to settle a large expiring short position due to be settled at the LME on December 21, 2011.  Glencore could have delivered Pacorini Vlissingen warrants to settle that short position, but at the time, Metro Detroit warrants were less valuable than Pacorini Vlissingen warrants.  As a result, it made more economic sense for Glencore to acquire and deliver Metro Detroit warrants, if it could.  Glencore therefore searched for and located a counterparty, JPMorgan, that was willing to swap Metro Detroit warrants plus a cash premium for Glencore's Pacorini Vlissingen warrants.  The swap made economic sense for Glencore because it enabled Glencore to receive a cash premium based on the difference in value between Pacorini Vlissingen warrants and Metro Detroit warrants.  The swap made economic sense for JPMorgan because JPMorgan acquired Pacorini Vlissingen warrants at an attractive price.  Upon completion of the swap, JPMorgan cancelled some of the Pacorini Vlissingen warrants and relocated the cancelled metal to Henry Bath's nearby warehouse in Rotterdam.  Storing the metal at Henry Bath Rotterdam was cheaper for JPMorgan than storing it at Pacorini Vlissingen and also gave JPMorgan the option of either holding the metal in cash-and-carry trades, selling it to customers, or delivering Henry

Bath warrants to the LME to satisfy LME shorts, depending on market conditions.  For these reasons among others, the swap was economically rational and profitable for both sides of the transaction irrespective of any alleged effect on warehouse queues.  *See generally* Class Cert. Opp., ECF No. 1013, at 11–12; Hausman Class Rep., ECF No. 1014-1, ¶ 18; Zona Class Rep., ECF No. 920-4, ¶ 52; Zona Dep., ECF No. 1014-6, at 108, 193, 219–20; Bodner Dep., ECF No. 1014-7, at 27–28.

78.    In December 2011, the 1.72 million metric tons involved in the swap between Glencore and JPMorgan represented over a third of global LME aluminum stocks and 80% of annual U.S. production.  Ex. 125, GS-METRO-00298894 at slides 21-22; *see also* Ex. 75 (Vazquez Decl.), §4.

**Defendants' Response:**  Defendants incorporate their response to Paragraph 77, including their response that the Vlissingen allegations are beyond the scope of Plaintiffs' complaints and have no relevance to Plaintiffs' efficient enforcer standing to assert their claims.  In addition, neither of Plaintiffs' cited exhibits supports Plaintiffs' assertion.  Plaintiffs mistakenly rely on Plaintiffs' Exhibit 125, which is an excerpt from a slide deck dated December 15, 2009 and thus provides no information regarding events in December 2011.  Section 4 of Plaintiffs' Exhibit 75 also does not include global LME aluminum stock figures or annual U.S. production figures.

79.    As part of the agreement between JPMorgan and Glencore, JPMorgan agreed not to sell the aluminum it received in Vlissingen to any third party before first removing it from the warehouse, transporting it, and then re-warehousing it in the JPMorgan-controlled Henry Bath warehouse in Rotterdam.  Ex. 123, JPMS-ALI-0000426; *see also* IP Amended Complaint, 15-cv-08307 ECF No. 35, ¶16.  After the swap, JPMorgan did what it agreed to do and cancelled the warrants for its aluminum in Vlissingen, which drove the queue from 289 days to 450 days from

December 21, 2011 to mid-February 2012.  5/4/16, 13-md-02481 ECF No. 1195-2, Gilbert Rpt.,

¶¶30-37.  The Rotterdam premium also rose sharply.  *Id.*

    **Defendants' Response:**  Defendants incorporate their response to Paragraph 77, including

their response that the Vlissingen allegations are beyond the scope of Plaintiffs' complaints and

have no relevance to Plaintiffs' efficient enforcer standing to assert their claims.  Defendants also

dispute Plaintiffs' assertions regarding the alleged effects of the transaction on the Vlissingen

queue and the Rotterdam premium, which are not supported by the cited exhibits.  Defendants

further object to Plaintiffs' reliance on the allegations of the IPs' Amended Complaint, which is

not competent evidence.  *See*, *e.g.*, *Gottlieb*, 84 F.3d at 518.

    80.    Defendants knew that cancellations would drive the queue.  Ex. 80 (SR) at 208-212

(Jacques Gabillon of Goldman admits that cancellations drive the queue); Ex. 126 (Askew Dep.

Tr.) at 133:1-8 ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████;

Ex. 127 (Goertzen Dep. Tr.) at 244:16-247:5 (Peter Goertzen, aluminum trader at Goldman Sachs:

"Everything else equal, I think that the – I believe that the longer the queue could potentially have

an upwards effect on premiums.").

    **Defendants' Response:**  Defendants do not dispute that warrant cancellations can

contribute to the lengthening of a warehouse load-out queue if load-out rates are held constant.

That fact, however, has no relevance to Plaintiffs' efficient enforcer standing to assert their claims.

Moreover, none of Plaintiffs' cited exhibits supports their assertion regarding Defendants'

knowledge, and Plaintiffs cite no evidence relating to JPMorgan, Glencore, Henry Bath, or

Pacorini.  Defendants' purported knowledge of the potential effect of warrant cancellations on

queue length is also irrelevant to this motion.  Defendants further object to Plaintiffs' reliance on the Senate report, which consists of inadmissible hearsay.

81.     Defendants knew that queues drive up the regional premia.  Ex. 128, GS-METRO-00021326 at 26 (the premium will go "raging higher" once Metro "lock[s]" certain aluminum owned by JPMorgan into one of its LME warehouses); Ex. 129, GS-METRO-00020303 at 03, ("What is true though, is that the metal we [Metro] get is withheld from consumers and makes the [MW] premium go up . . . ." ); Ex. 130, PUSA-E-00040230 at 30 ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████   Ex. 106, PUSA-E00167433 at 35 (in a meeting between Glencore aluminum head Gary Fegel and Pacorini warehousing head Peter Waszkis, Waszkis informed other Pacorini executives including the head of Pacorini U.S., Mario Casciano and the head of Pacorini Vlissingen, Simon Yntema, that Glencore wanted to create a "bottleneck" at Pacorini's Vlissingen warehouse: "They [Glencore] have decided that for this material we will make our own Detroit: and it will be Vlissingen."); *see also generally* Ex. 75 (Vazquez Decl.), §3.

**Defendants' Response:**  Defendants do not dispute that load-out queues at LME warehouses in some circumstances could increase the portion of all-in aluminum prices attributable to a regional premium by depressing the LME cash price relative to the all-in price.

Defendants dispute that queues drive up all-in prices for aluminum, and Plaintiffs do not appear to contend otherwise in Paragraph 81.  Finally, the alleged effect of load-out queues on regional premiums has no relevance to Plaintiffs' efficient enforcer standing to assert their claims, except to the extent that it shows that Plaintiffs' alleged injury here is indirect, speculative, and disputed. Plaintiffs' Vlissingen allegations are also beyond the scope of all of Plaintiffs' claims other than the Fuji claims because Plaintiffs other than Fuji were denied leave to add those allegations to their complaints.  *See* Leave to Amend Order, ECF No. 946, at 11, 14, 18–19; Class Cert. Order, ECF No. 1274, at 27–29, 91–95.

82.    Defendants intended to and did drive up the MWP, which made the all-in price higher than it would have otherwise been.  Ex. 135 (Evans Dep. Tr.) at 62:8-63:5 ("In the business we do, you're normally hedging the base price [LME Cash Price] of all the material that you own [a]nd so the money you earn as a [physical aluminum] trader is primarily earned around the premium."); Ex. 136, JPMS-ALI-0992847 at slide 11 ████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████ Ex. 106, PUSA-E00167433 at 36 ("The bottleneck effect . . . will support premiums" and off-warrant aluminum will be sold at those higher premiums.); Ex. 138, PUSA-E00168071 at 74 ██████████████████████████████████████████████████████████████ ██████████ Ex. 139, GS-METRO-00209488 at 88 ████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████ Ex. 132, JPMS-ALI-0258931 at 31 ████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████ *see also generally* Ex. 75 (Vazquez Decl.), §3.

**Defendants' Response:**  Defendants dispute that they intended to and did drive up the Midwest Premium and that any increase in the Midwest Premium caused by load-out queues at LME warehouses made the all-in price of aluminum higher than it otherwise would have been. None of Plaintiffs' cited exhibits provides any support for either assertion.  These disputed issues also have no relevance to Plaintiffs' efficient enforcer standing to assert their claims, except to the extent that they show that Plaintiffs' alleged injury here is indirect, speculative, and disputed.

83.    Defendants admit that this was an aluminum-trader-driven scheme to restrain physical supply and increase the price of aluminum.  *See* Ex. 140 (Casciano Dep. Tr.) at 285:13-286:7 (the traders cancelled warrants and took aluminum off warrant to "cow pasture[s]" instead of delivering it to customers, causing "tightness in the market"); Ex. 141, PUSA-E00043512 at 12 (It was "very much in the interest of the traders to 'dry' out the market and squeeze the premium, so the more they park in Cow pasture, [the] more pressure they can put on the premium."); Ex. 142, PUSA-E00044793 at 94 ("nobody mentions that traders keep the bottleneck tight to inflate the premium?"); Ex. 143, PUSA-E00042956; Ex. 140 (Casciano Dep. Tr.) at 333:11-336:5 (Casciano stated that the aluminum traders' creation of bottlenecks "was one way to manipulate the market, not allowing metal to flow into the consumption market and keep[ing the] market tight and keep[ing] the premium at all-time high, despite the huge amount of metal on and off warrant."); Ex. 143, PUSA-E00042956 (Casciano's colleague, Sergio Garbin, believed that physical aluminum traders were preventing consumers from sourcing aluminum from LME warehouses in order to keep premiums high); Ex. 141, PUSA-E00043512 at 12 ("They have plenty of [aluminum] units available, but they are not selling it, squeezing the premium and pushing clients to sign long term delivery contracts."); Ex. 140 (Casciano Dep. Tr.) at 286:1-6 ("the large cancellations of

aluminum done by traders or banks . . . created the tightness in the market"); *id.* at 339:8-23 (Casciano firmly believed that the MWP increased because of physical traders' conduct.).

**Defendants' Response:**  Defendants dispute that there was an "aluminum-trader-driven scheme" to restrain the supply of physical aluminum and to increase all-in aluminum prices, and also dispute that they "admitted" the existence of such a "scheme."  None of Plaintiffs' cited exhibits supports the existence of such a scheme or such an admission.  Although Plaintiffs refer to an admission by "Defendants," they cite only Pacorini documents and testimony, and the cited evidence refers not to a collusive scheme but to unilateral conduct occurring in the market due to market conditions, including a steep contango in the LME futures market.  In any event, these merits issues have no relevance to Plaintiffs' efficient enforcer standing to assert their claims.

84.    Defendants profited from the conspiracy by selling physical aluminum into the market at inflated prices, including the MWP and Rotterdam Premium.  Ex. 144, GLEN-ALIDATA-0000001; Ex. 78 (Brigham Dep. Tr.) at 80:19-21 (between 2010 and December 2014, Glencore sold more than $13 billion worth of aluminum, which price included the MWP); Ex. 80 (SR) at 183 (Goldman held more than $3.2 billion dollars of physical aluminum in 2012 and sold half in early 2013); 13-md-2481 ECF No. 1269-1 at slide 22 (JPMorgan sold off 3.3 million metric tons worth over $7 billion); Ex. 108 (Sobol Dep. Tr.) at 345:24-346:7(JPMorgan "frequently" sold physical aluminum to consumers); *see also generally* Ex. 75 (Vazquez Decl.), §4.

**Defendants' Response:**  Defendants dispute the existence of any conspiracy or that they profited therefrom, and Plaintiffs' cited exhibits fail to support either assertion.  Moreover, Plaintiffs' descriptions of their exhibits misstate Defendants' aluminum transactions during the relevant period.  First, Plaintiffs cite their own class certification slide deck in support of their claim that "JPMorgan sold off 3.3 million metric tons worth over $7 billion," but that presentation

relies on a portion of Dr. Zona's class certification opening report describing JPMorgan's putative aluminum *holdings*, not its *sales*. Zona Class Rep., ECF No. 1195-6, ¶¶ 52–53. Second, Plaintiffs' "sales" figures mistakenly include transactions involving LME warrants that were not sold to customers for physical delivery, but instead were delivered back to the LME to satisfy shorts. *See* Ex. 80, Senate Report at 211 (half of Goldman's LME warrants at the beginning of 2013 used to settle its short January contracts). By definition, a party that delivers warrants to the LME to satisfy shorts receives no regional or other premium on the warranted metal it delivers. Third, Plaintiffs' Exhibit 78 states, in the context of Glencore's purchases of aluminum, only the general proposition that the MWP was a portion of the MWTP, and does not discuss any Defendant's sales of aluminum, much less the price terms of those sales as Plaintiffs suggest.

Defendants do not dispute that Goldman Sachs, JPMorgan and Glencore sold physical aluminum to consumers during the relevant period. But, with the exception of Ampal, which acquired a small amount of aluminum from Glencore, Plaintiffs do not claim that they purchased any aluminum from Defendants. As a result, sales by Defendants are irrelevant to this motion.

85. Defendants are very large, publicly traded companies. JPMorgan, Goldman Sachs, and Glencore reported 2019 revenues of $118.7 billion, $36.6 billion, and $215 billion, respectively. *See* Ex. 82 (JPMorgan Chase & Co. Annual Report 2019) at 3; Ex. 83 (The Goldman Sachs Group, Inc., Annual Report (2019)) at 2; Ex. 84 (Glencore Annual Report (2019)) at 5. Recently, Goldman Sachs settled a dispute with the Malaysian government for $3.9 billion, but still posted a profit in its second quarter of this year. *See* Ex. 85 (Ben Winck, *Goldman Sachs cuts quarterly profit by 91% after $3.9 billion 1MDB settlement*, Market Insider (Aug. 7, 2020)).

**Defendants' Response:** Defendants do not dispute that Goldman Sachs, JPMorgan, and Glencore are large, publicly traded corporations. But that fact has no relevance to whether

Plaintiffs have efficient enforcer standing to assert their claims. Plaintiffs' entirely gratuitous reference to a 2020 settlement between Goldman Sachs and the Malaysian government in a completely unrelated matter that does not even involve antitrust claims is likewise irrelevant to Defendants' motion.

86.  "The plaintiffs suffered harm because [of] defendants' manipulation of the Midwest Premium [which] raised the prices that plaintiffs paid when they purchased aluminum." *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 95 (2d Cir. 2019).

**Defendants' Response:** Defendants do not dispute that the Second Circuit's 2019 opinion contains the sentence Plaintiffs quote. That sentence, however, has no relevance to this motion. In deciding the appeal, the Second Circuit made clear that it "focus[ed] on the sufficiency of the plaintiffs' legal theory, rather than on their evidence." *Eastman Kodak*, 936 F.3d at 93 n.3. The Second Circuit's decision was directed solely at the antitrust injury question presented in that appeal and did not purport to determine any factual or legal questions for purposes of any future motions on different subjects, such as the umbrella standing question presented by Defendants' current motion.

## V.  Defendants' Conduct Broke the Manner in Which the LME Was Intended to Function

87.  Historically, the LME had emphasized the LME warehouse market was necessary because its "'presence, or threat, of delivery has the result of constantly ensuring that the LME price is in line with the physical market price.'" *See* Ex. 80 (SR) at 175; Ex. 145, London Metal Exchange, Price Convergence, https://www.lme.com/en-GB/Trading/Physical-market-services/Price-convergence (last visited Oct. 19, 2020) ("Price convergence is another very important feature of the LME and its operations. The LME licenses warehouses to provide a market of last resort and to ensure the LME price stays in line with the physical/spot price. The underlying threat

of the delivery of physical material – made possible by the network of LME-approved warehouses – is what keeps the LME price in line with the physical price. . . . In the unlikely event of the LME price straying higher than the spot price, traders can arbitrage the difference by buying physical spot metal and selling it on the LME, then delivering it into LME-approved warehouses.  If the LME price falls lower than the spot the opposite takes place.  This price convergence, coupled with unprecedented global volumes, means the prices discovered on the LME's markets are used across the world as reference prices in all sectors of the metals value chain.").

**Defendants' Response:**  Defendants do not dispute that the LME has stated that one of its goals is for the LME price to track the price of the underlying physical commodity—what the LME calls price convergence.  That issue, however, has no relevance to Plaintiffs' efficient enforcer standing to assert their claims.  Defendants also object to Plaintiffs' reliance on the Senate report, which consists of inadmissible hearsay.

88.   "The LME warranting system has, for much of its history, enabled the LME to function as a market of last resort for market participants seeking to buy metal."  Ex. 80 (SR) at 175; *see also* Ex. 134, GS-METRO-00713140 at 207 ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Defendants' Response:**  Defendants do not dispute that the LME sometimes has been described as a "market of last resort."  The LME's purported role as a market of last resort, however, has no relevance to whether Plaintiffs have efficient enforcer standing to assert their claims.  Defendants also object to Plaintiffs' reliance on the Senate report, which consists of inadmissible hearsay.

89.    Defendants' queue-building conduct in the warehouses inflated the all-in price (LME price plus the MWP) so no actual aluminum could be obtained from the LME warehouses as the wait time to obtain such aluminum had skyrocketed from just a few weeks to over two years. *see also generally* Ex. 75 (Vazquez Decl.), §3 (describing how the warehouses compete with physical users for aluminum); *see* ¶¶64-80 *supra* (detailing defendants amassing of physical aluminum and queue building).

**Defendants' Response:**  Defendants dispute that anything they did inflated the all-in price of aluminum or, in a time of great surplus, made it more difficult for aluminum users to obtain the aluminum they needed.  Those merits issues, however, have no relevance to whether Plaintiffs have efficient enforcer standing to assert their claims.

November 20, 2020                              Respectfully submitted,

                                              s/  Robert D. Wick
                                              Robert D. Wick (*rwick@cov.com*)
                                              Henry Liu (*hliu@cov.com*)
                                              John S. Playforth (*jplayforth@cov.com*)
                                              COVINGTON & BURLING LLP
                                              One CityCenter
                                              850 Tenth Street, N.W.
                                              Washington, D.C.  20001
                                              Telephone:  (202) 662-6000
                                              Facsimile:  (202) 662-6291

                                              *Attorneys for Defendants Henry Bath LLC, JP*
                                              *Morgan Securities plc, and JPMorgan Chase Bank,*
                                              *N.A.*

                                              /s/  Richard C. Pepperman II (on consent)[17]
                                              Richard C. Pepperman II
                                              (*peppermanr@sullcrom.com*)
                                              Suhana S. Han (*hans@sullcrom.com*)
                                              William H. Wagener (*wagenerw@sullcrom.com*)
                                              SULLIVAN & CROMWELL LLP
                                              125 Broad Street
                                              New York, New York  10004-2498
                                              Telephone:  (212) 558-4000
                                              Facsimile:  (212) 558-3588

                                              *Attorneys for Defendants Goldman Sachs & Co. LLC,*
                                              *J. Aron & Company, Goldman Sachs International,*
                                              *Mitsi Holdings LLC and Metro International Trade*
                                              *Services LLC*

---

[17]  Defendants use electronic signatures with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

/s/  Boris Bershteyn (on consent)
Boris Bershteyn (*boris.bershteyn@skadden.com*)
Julia K. York (*julia.york@skadden.com*) (pro hac vice)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: 212-735-3834

*Attorneys for Defendant Access World (USA) LLC (f/k/a Pacorini Metals USA, LLC)*

s/ Eliot Lauer (on consent)
Eliot Lauer (*elauer@curtis.com*)
Jacques Semmelman (*jsemmelman@curtis.com*)
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, New York  10178
Telephone:  (212) 696-6000
Facsimile:  (212) 697-1559

*Attorneys for Defendant Glencore Ltd., Glencore International AG, and Access World (Vlissingen) B.V.*